[No. B186149. Second Dist., Div. Six. June 28, 2006.]

DENNIS C. SCHNEIDER, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

### COUNSEL

James S. Burling and Lawrence G. Salzman for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Tom Green, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, John Saurenman and Rosana Miramontes, Deputy Attorneys General, for Defendant and Respondent.

### OPINION

**YEGAN, J.**—Here we conclude that the Legislature has not recognized an ocean boater's "right to a view" of the coastline as a factor in regulating development. The Legislature has given the California Coastal Commission (Coastal Commission) enumerated powers to regulate such development. But the Legislature has not empowered the Coastal Commission to "add" the factor of a boater's "right to a view" of the coastline as a factor to deny or restrict development in the coastline zone.

Dennis C. Schneider appeals from an order denying his petition for administrative mandamus to vacate a Coastal Commission decision imposing special conditions on a Coastal Development Permit to build a residence. (Pub. Resources Code, § 30801.)[1] We reverse and direct the superior court to issue a peremptory writ commanding the Coastal Commission to set aside its decision and rehear the matter. (Code Civ. Proc., § 1094.5, subd. (f).) On rehearing, Coastal Commission may not consider whether the proposed development impacts views of the coast from offshore, ocean-based vantage points. (See, e.g., *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1174 [56 Cal.Rptr.2d 223].)

## *Facts and Procedural History*

Appellant owns a 40-acre oceanfront parcel north of Cayucos on the Harmony Coast. The property is in an Ocean Shoreline Sensitive Resource Area, zoned agricultural, and is used for cattle grazing. It has a steplike topography with a steeply sloped ridge that extends down to a flat marine terrace. The marine terrace is about 200 feet wide and abuts the ocean bluff. There is no beach below the bluff. A commercial abalone farm is on a nearby parcel.

On February 24, 2000, the San Luis Obispo County Planning Commission (County) granted appellant a permit to construct a 10,000-square-foot residence, a barn, and a 1.25-mile access road/driveway from Highway 1 to a building site on the southeast end of the marine terrace. The Coastal Development Permit (CDP) included 27 conditions which addressed concerns about steep slopes, erosion, drainage, scenic and visual resources, agricultural use, and potential environmental impacts.

On April, 3, 2000, two Coastal Commission members appealed County's issuance of the permit on the ground that the proposed development was inconsistent with the policies and ordinances of the San Luis Obispo County Local Coastal Program (LCP). (§ 30603, subds. (a)(4) & (b)(1).)

Coastal Commission conducted a de novo hearing and found that the proposed development would be visible from the ocean. On April 15, 2004, it conditionally approved the CDP but imposed 15 special conditions requiring, among other things, that the project be resited at a higher elevation on the northwest corner of the marine terrace and that "[a]ll development (i.e., the

---

[1] All statutory references are to the California Coastal Act of 1976 contained in the Public Resources Code unless otherwise stated.

residence, all impermeable pathways, turnarounds, courtyards, garages, swimming pools, retaining walls, etc.) shall be confined within an area of no greater than 5,000 square feet." Coastal Commission required that all structures be single story, that the barn not be constructed, and that the access road/driveway be relocated to reduce its length, visibility, and impact on agricultural land.

Appellant filed a petition for administrative mandamus alleging that Coastal Commission had no authority to impose development conditions to protect views of the coastline from offshore, ocean-based vantage points. Coastal Commission argued that the enjoyment of uncluttered views from the ocean was a public resource protected by the LCP.

The trial court agreed with the Coastal Commission saying "that the beauty of a sunrise from a vantage point offshore is afforded the same protection as a sunset seen from land. [¶] The Court fully appreciates the difficulties [appellant] has had with the approval process and the conditions attached to the approval of his beautifully designed residential project. It may be compared to 'being nibbled to death by ducks' . . . . While this Court might not agree with any or all of the modifications or conditions, it fully understands the reasons given by the Coastal Commission and finds that substantial evidence exists in the record for each of them."

As we shall explain, Coastal Commission views and those of the trial court, cannot be sustained. The Coastal Commission has subordinated a landowner's real property rights to the occasional boater's "right to a view" of the coastline.[2] If and when the California Legislature expressly codifies a boater's "right to a view" of the coastline, the courts can and will lawfully give it credence. But the Coastal Commission is not empowered to legislate a boater's "right to a view" of the coastline.

### Standard of Review

In an action for administrative mandamus, the court's inquiry extends to whether the agency acted in excess of jurisdiction or abused its discretion by not proceeding in the manner required by law. (Code Civ. Proc., § 1094.5, subd. (b); *La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 814 [124 Cal.Rptr.2d 618].) Where jurisdiction

---

[2] We do not invent the phrase "occasional boater," to support our ruling. A coastal landowner is on his or her property every day. Boaters, if any, pass by the property infrequently. This observation is particularly apt on the Harmony Coast.

involves the interpretation of a statute, regulation, or ordinance, the issue of whether the agency proceeded in excess of its jurisdiction is a question of law. (Cal. Administrative Mandamus (Cont.Ed.Bar 2005) § 6.29, p. 171; see, e.g., *La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 239–240 [86 Cal.Rptr.2d 217]; *Yamaha Corp. of America v. State Bd. of Equalization* (1999) 73 Cal.App.4th 338, 349 [86 Cal.Rptr.2d 362] [agency's interpretation of sales tax statutes and regulations subject to independent review].) "A court does not, in other words, defer to an agency's view when deciding whether a regulation lies within the scope of the authority delegated by the Legislature. The court, not the agency, has 'final responsibility for the interpretation of the law' under which the regulation was issued. [Citations.]" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11, fn. 4 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

### San Luis Obispo County LCP

■ The California Coastal Act of 1976 (Coastal Act; Pub. Resources Code, § 30000 et seq.) requires that local governments within the coastal zone prepare a Local Coastal Program (LCP) and implement ordinances to promote the Coastal Act's objectives of protecting the coastline and its resources and maximizing public access. (§§ 30001.5, 30512, 30513; *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1011 [73 Cal.Rptr.2d 841, 953 P.2d 1188].) "Local governments are responsible for creating their LCP's. [Citations.] The Coastal Commission was established to review these LCP's and certify the LCP's meet the requirements of the Act." (*Conway v. City of Imperial Beach* (1997) 52 Cal.App.4th 78, 86.) After an LCP is certified by the Coastal Commission, development review authority is "delegated to the local government that is implementing the local coastal program . . . ." (§ 30519, subd. (a); see also *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569 [106 Cal.Rptr.2d 14].)

■ Where the local government grants a CDP, the action may be appealed to the Coastal Commission by the applicant, any aggrieved person, or two members of the Coastal Commission. (§ 30625, subd. (a).) On appeal, the Coastal Commission reviews the matter de novo and may take additional evidence. (§ 30621, subd. (a); *City of Half Moon Bay v. Superior Court* (2003) 106 Cal.App.4th 795, 804 [131 Cal.Rptr.2d 213].) Its jurisdiction, however, is limited. (*City of Half Moon Bay*, at p. 804.) "The only grounds for appeal are that the locally approved development does not conform to the standards of a

certified LCP or the Coastal Act's access policies. (§ 30603, subd. (b)(1).)" (*Kaczorowski v. Mendocino County Bd. of Supervisors, supra,* 88 Cal.App.4th at p. 569.)

*Section 30251*

The issue is whether the Coastal Commission may, in effect, add language to section 30251 by construing it. The Attorney General argues that it may do so. Section 30251 of the Coastal Act provides that: "The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to *protect views to and along the ocean and scenic coastal areas*, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas. . . ." (Italics added.) The statute does not expressly state a vantage point.

■ The Coastal Commission and the Attorney General's construction of the section adds the words "and from" between the italicized words "*along,*" and "*the.*" The statute would thus read, "protect views to and along, and from, the ocean . . . ." This expansive reading of the statute stretches the fabric too thin. The courts are loath to construe a statute which has the effect of "adding" language to a statute. (E.g., *People v. Buena Vista Mines, Inc.* (1996) 48 Cal.App.4th 1030, 1034 [56 Cal.Rptr.2d 21].) Courts may add language to a statute in extreme cases where they are convinced the Legislature inadvertently failed to utilize the words which would give purpose to its pronouncements. (*Id.* at p. 1034.) In our view, this is not such a case. At this late date, it is unreasonable to assume that the Legislature meant to include ocean-based views to the shore when it enacted section 30251 30 years ago. Moreover, we believe that it is unreasonable to assume that the Legislature has ever sought to protect the occasional boater's views of the coastline at the expense of a coastal landowner.

Historically, the protection of public views "to and along the ocean and scenic coastal areas" has been construed to mean land-based scenic views from public parks, trails, roads and vista points. (See, e.g., *La Costa Beach Homeowners' Assn. v. California Coastal Com., supra,* 101 Cal.App.4th at p. 808 [construing § 30251 to require view corridor of beach and ocean from Pacific Coast Highway]; *Landgate, Inc. v. California Coastal Com., supra,* 17 Cal.4th at p. 1011 [73 Cal.Rptr.2d 841, 953 P.2d 1188] [view corridor from coastal canyon]; *Paoli v. California Coastal Com.* (1986) 178 Cal.App.3d 544,

551–552 [223 Cal.Rptr. 792] [open-space easement to mitigate adverse visual impact of access road, inn, and residence].)

County's LCP has 11 policies for visual and scenic resources, none of which refer to the protection of offshore, ocean-based vantage points. Coastal Commission asserts that it can impose an offshore visual resource protection policy because section 30251 and the LCP do not differentiate between offshore and onshore view corridors. Other than its ipse dixit statement, the Coastal Commission cites no authority to support this theory.

The administrative record is also sparse. At the Coastal Commission hearing on the permit application, Executive Director Peter Douglas testified that the State of Maine had recently amended its coastal management program to incorporate an offshore visual protection policy. Douglas stated that a similar offshore visual protection policy was imposed on a nine-unit project north of appellant's property and that Coastal Commission's efforts to protect public views from the ocean was supported by the United States Sailing Association. At the de novo hearing on the CDP application, Coastal Commission Executive Director Douglas testified that many of the "conditions that the staff is recommending here today . . . *aren't part of, precisely, the county's LCP. . . .*" (Italics added.) Douglas stated that "the Commission, clearly, has original permit jurisdiction in state waters, out the three miles. You have a responsibility under the Coastal Act to protect views to and along the ocean, and to the ocean means both from the land . . . to the coast, and from the sea to the coast."[3]

■ In construing section 30251 and the LCP, we look to California law not the State of Maine or the United States Sailing Association. "The Coastal Act sets minimum standards and policies with which local governments within the coastal zone must comply; it does not mandate the action to be taken by a local government in implementing local land use controls." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 572 [205 Cal.Rptr. 801, 685 P.2d 1152].)

The Policies for Visual and Scenic Resources section of the LCP (chapter 10) refers to section 30251 of the Coastal Act which, as indicated, provides: "Permitted development shall be sited and designed *to protect views to and along the ocean and scenic coastal areas* . . . ." (Italics added.) The LCP "INTRODUCTION" section recites: "The California Coastal Commission has adopted the following statement regarding Section 30251: [¶] 'The primary

---

[3] We are unable to agree with this leap in logic. "To and along the ocean" does not encompass "from the sea to the coast."

concern under this section of the Act is the protection of ocean and coastal views <u>from public areas</u> such as highways, roads, beaches, parks, coastal trails and accessways, vista points, *coastal streams and waters used for recreational purposes*, and other public preserves <u>rather than</u> coastal views <u>from private residences</u> where no public vistas are involved.' " (Italics added.)

■ We construe the phrase "coastal streams and waters used for recreational purposes" to mean rivers, streams, creeks, sloughs, lakes, reservoirs, lagoons, and land-based bodies of water.[4] (See Civ. Code, § 3534 ["Particular expressions qualify those which are general"]; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159–1160 [278 Cal.Rptr. 614, 805 P.2d 873].) Section 30251 of the Coastal Act makes no reference to public view corridors that originate offshore, from the ocean to the land.

Coastal Commission reviewed the proposed development based on the Policies for Visual and Scenic Resources set forth in the LCP. (§ 30604, subd. (b).) Visual and Scenic Resource Policy 4 provides: "New development shall be sited to minimize its visibility from public view corridors. Structures shall be designed (height, bulk, style) to be subordinate to, and blend with, the rural character of the area. New development which cannot be sited outside of public view corridors is to be screened using native vegetation; however, such vegetation, when mature, must also be selected and sited in such a manner as to not obstruct major public views."

Visual and Scenic Resource Policy 2 provides: "Permitted development shall be sited so as to protect views to and along the ocean and scenic coastal areas. Whenever possible, site selection for new development is to emphasize locations not visible from major public view corridors. In particular, new development should utilize slope created 'pockets' to shield development and minimize visual intrusion."

Coastal Commission found: "In addition to the scenic views from Highway One and other inland areas, [Visual and Scenic Resource] [P]olicy 2 protects views from nearshore waters. In other words, the views of fishers, boaters,

---

[4] Chapter 10 of the LCP refers to a 1980 Visual and Scenic Resources Study, which provides a detailed description of the scenic qualities of county coastal areas. It states: "Offshore viewing (unlike the previous view corridors) *is primarily concerned with the visual quality of the ocean seen from the shore* rather than the ability to see or enhance a view along a public highway or park. . . . Specific offshore viewing concerns include the location and appearance of offshore drilling and loading platforms, LNG terminal sites, the protection of offshore rocks and reefs, as well as long-range views across bays, coves, and inlets." (Italics added.)

kayakers, surfers, et cetera who may be present at different times in the water should also be considered. Because of the sheer cliff edge and the relative flat marine terrace, the proposed development (i.e., residence, lounge, barn, access road improvements, water tanks, etc.) would be highly visible, particularly from nearshore waters. . . . [¶] Although not visible [by] travelers along Highway One, the residential site on the marine terrace would be visible from offshore locations."

■ Neither section 30251 nor the LCP support an unwritten policy to protect scenic views of the coast from offshore, ocean-based vantage points. The LCP protects land-based "major public view corridors," not offshore views by the occasional boater, kayaker or surfer. Such an ocean-based view corridor would change minute by minute depending on where the boater, kayaker or fisher happens to be. The Coastal Commission found that the view corridor originated from "nearshore waters" but considered vantage points half a mile and a mile offshore. Executive Director Douglas opined that the view corridor could originate from a vantage point as far out as three miles offshore.

■ When Coastal Commission certified the LCP in 1988, it lacked authority to " 'create or originate any land use rules and regulations' " or draft any part of the coastal plan. (*Yost v. Thomas, supra,* 36 Cal.3d at p. 572, citing *City of Chula Vista v. Superior Court* (1982) 133 Cal.App.3d 472, 488 [183 Cal.Rptr. 909].) In reviewing the proposed development to determine whether it was consistent with the certified LCP, Coastal Commission was not empowered to adopt a new offshore visual resource policy for San Luis Obispo County. (§ 30604, subd. (b); Cal. Code Regs., tit. 14, § 13119.) "Administrative action that is not authorized by, or is inconsistent with, acts of the Legislature is void. [Citations.]" (*Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 391 [211 Cal.Rptr. 758, 696 P.2d 150]; see, e.g., *City and County of San Francisco v. Board of Permit Appeals* (1989) 207 Cal.App.3d 1099, 1110 [255 Cal.Rptr. 307] [administrative appeals board had no power to disregard or amend ordinances defining its authority].)

*Remedy*

Appellant argues that the proper remedy is to reinstate the original CDP issued by County. We disagree. The LCP requires that the scenic landscape of the Harmony Coast be preserved (Visual and Scenic Resource Policy 1) and that the development be designed to be subordinate to and blend with the natural character of the area (Visual and Scenic Resource Policy 4). The

record indicates that the 10,000-square foot residence with its large windows and pyramid-shaped skylights would be significantly larger than neighboring farm homes. Certain parts of the development (i.e., the house, the access road, or the barn) will be visible from Estero Park, Sea West Ranch, and other land-based public view corridors. In order to mitigate adverse impacts, Coastal Commission found that the proposed residence should be smaller and built higher up the ocean bluff at the west end of the marine terrace.

Appellant complains that relocating the residence to the northwest side of the marine terrace will make it more visible and expose it to rock falls, erosion, and a canyon outwash.[5] The geological hazards are significant and include 40-degree slopes and large boulders. Appellant will have to build a rock fence with cables and I-beams, and a series of upslope walls to protect the residence from falling boulders.

Many of the special conditions imposed by the Coastal Commission were premised on the erroneous theory that section 30251 and the LCP protected public views from the ocean to the land. It influenced how the Coastal Commission balanced other LCP policies and Local Coastal Zone Land Ordinance restrictions. The complexity of these issues is reflected in Coastal Commission's revised findings, which span 36 pages and includes 83 pages of exhibits, maps, and photos.

In the words of Coastal Commission Executive Director Douglas, the property "is, obviously, a very sensitive site, given its location, and remoteness, and undeveloped character." We agree. The Harmony Coast is an Ocean Shoreline Sensitive Resource Area with undeveloped coastal bluffs, marine terraces, and steep ridgelines. Reasonable minds may differ on what conditions should be imposed for the development. But, such conditions may not be predicated on an offshore visual and scenic resource protection policy.

■ Coastal Commission requests that we defer to its interpretation of the Coastal Act in determining the scope of the LCP. Its role, however, is interpretative not quasi-legislative. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at pp. 7–8.) "Because an interpretation is an agency's *legal opinion,* however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference. [Citation.]" (*Id.,* at p. 11.)

---

[5] Evidence was received that the recommended building site was 50 to 70 feet higher up the marine terrace and would be more visible from public viewing areas down the coast and along Estero Bay.

*Conclusion*

The judgment is reversed. The superior court is ordered to issue a peremptory writ commanding the Coastal Commission to vacate its decision and rehear the matter consistent with this opinion. Appellant is awarded costs on appeal.

Gilbert, P. J., and Perren, J., concurred.

A petition for a rehearing was denied July 19, 2006.