Filed 11/25/24; Modified and Certified for Pub. 12/20/124 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HUMBOLDT ALLIANCE FOR RESPONSIBLE PLANNING,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA COASTAL COMMISSION,<br><br>    Defendant and Respondent;<br><br><br>BUREAU OF INDIAN AFFAIRS,<br>    Real Party in Interest. | A169773<br><br>(Humboldt County Super. Ct. No. CV190866) |

Pursuant to the Coastal Zone Management Act of 1972 (16 U.S.C. § 1451 et seq.; CZMA), the United States Bureau of Indian Affairs (BIA) submitted a consistency determination to defendant and respondent California Coastal Commission (Commission) for the construction of a five-story hotel on land owned by the Cher-Ae Heights Indian Community of Trinidad Rancheria (Tribe). The BIA determined that the hotel project was consistent with the California Coastal Act of 1976 (Pub. Resources Code,

1

§ 30000 et seq.; Coastal Act).[1]  The Commission conditionally concurred with the BIA's consistency determination.

Plaintiff and appellant Humboldt Alliance for Responsible Planning (HARP) challenged the Commission's decision by filing a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5).  The trial court denied the petition.  On appeal, HARP argues that the Commission:  (1) applied the wrong standard in assessing the visual impact of the proposed hotel; (2) failed to sufficiently state its basis for finding that the hotel would be visually compatible with the hotel's surroundings; (3) improperly relied on its Environmental Justice Policy (EJP) and the doctrine of tribal sovereignty; (4) abused its discretion by issuing a conditional concurrence, rather than an objection; and (5) failed to make express findings as to fire protection services for the hotel—which were not adequate based on the evidence in the administrative record.  We reverse in part, finding that there is insufficient evidence to support a finding of adequate fire protection services for the hotel as required by section 30205, subdivision (a).  We affirm in all other respects.

## I.  BACKGROUND

### A.  Relevant Law

We begin with a brief overview of the relevant statutes and regulations.

The CZMA declares a national policy "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations."  (16 U.S.C. § 1452(1).)  One of the CZMA's stated purposes is "to encourage coordination and cooperation" among federal and state agencies in their "regulation of land use practices affecting the coastal and ocean resources."  (*Id*. § 1452(5).)  If a federal

_____

[1] All further statutory references are to the Public Resources Code unless otherwise specified.

2

agency plans to commence an activity "within or outside the coastal zone" that affects coastal land or resources, it "shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." (*Id.* § 1456(c)(1)(A).) To that end, the federal agency is required to "provide a consistency determination to the relevant State agency." (*Id.* § 1456(c)(1)(C).) The state agency may concur, conditionally concur, or object to that determination. (15 C.F.R. §§ 930.4(a) & 930.41(a).)

"California's coastal zone includes coastal waters and adjacent shorelands, and extends three miles seaward from the State's coast line." (*California v. Norton* (2002) 311 F.3d 1162, 1167.) The Commission is the state's "designated . . . coastal zone planning and management agency" and "may exercise any and all powers set forth in the [CZMA]." (§ 30330.) It is responsible for implementing the provisions of the Coastal Act, which is the state's federally approved coastal zone management program. (§ 30008.) Implementing those provisions, the Commission certifies coastal programs of local California governments located in coastal zones. (§ 30500.) As relevant here, the enforceable policies of the Coastal Act address the adequacy of public services for new developments (§ 30250, subd. (a)) as well as a development's visual compatibility with its surroundings (§ 30251).

B. Administrative Proceedings

The Tribe owns approximately 46.5 acres of land east of the City of Trinidad. The BIA holds the land in trust for the Tribe. Although the land falls outside of California's coastal zone due to its federal trust status, it is still subject to the CZMA. (16 U.S.C. § 1456(c)(1)(A).)

The Tribe seeks to build a five-story hotel on the land, next to its existing casino. Because the project requires the BIA to approve a loan

3

guarantee and lease agreement, it is considered a federal activity that affects coastal resources and must comply with the CZMA. (16 U.S.C. § 1456(c)(1)(A).) Accordingly, in February 2019, the BIA submitted a consistency determination letter to the Commission. The BIA determined that the proposed project was consistent with the Coastal Act and requested that the Commission concur with its determination.

In June 2019, the Commission held a consistency determination hearing in San Diego. Commission staff recommended that the Commission object to the BIA's consistency determination based on the hotel's visual impact and the potential lack of an adequate water supply. Staff also noted that it had requested an extension from the BIA so the matter could be heard at the Commission's August 2019 meeting in Eureka and local residents could voice their opinions, but the BIA denied the request.[2] At the June hearing, the Commission (by a vote of six to three) followed staff's recommendation and objected to the BIA's consistency determination. Several commissioners requested that the BIA resubmit the project for consideration.

The BIA resubmitted its consistency determination the next month, and the Commission heard the matter at its August 2019 hearing in Eureka. Commission staff again recommended an objection based on the hotel's visual impact and the potential lack of an adequate water supply. As to the visual impact, staff stated that the project could be brought into compliance with the Coastal Act (specifically, section 30251) if the hotel's height was reduced

_____

[2] The BIA previously extended the deadline for the Commission's decision to June 14, 2019, and Commission staff noted that unless the BIA agreed to extend this deadline further, "federal statutory deadlines require the Commission to act by June 14th or else the Commission's concurrence with the consistency determination will be presumed."

4

from 64 feet to no more than 40 feet so that it is "not out of character" with its surroundings. At the August hearing, a motion was made to limit the hotel's height to 40 feet or less, but the Commission rejected it by a six to five vote. After discussing other issues, the Commission conditionally concurred with the consistency determination (by a vote of eight to three), with the condition that the BIA provide evidence of an adequate water supply before starting construction.

Staff prepared revised findings to reflect the Commission's conditional concurrence. HARP submitted written comments to these revised findings and requested that the Commission not adopt them. Its comments addressed, among other things, the adequacy of the water supply, the hotel's visual impact, and the Commission's improper reliance on the EJP. At its September 2019 hearing, the Commission adopted the revised findings.

C. Petition for Administrative Mandamus

HARP filed an administrative mandamus petition (Code Civ. Proc., § 1094.5), challenging the Commission's conditional concurrence. HARP argued that the conditional concurrence must be set aside because: (1) the Commission used the wrong legal standard in approving the visual aspects of the proposed hotel; (2) the Commission failed to state in sufficient detail the basis for its rejection of its staff's recommendation regarding the hotel's visual impacts; (3) the Commission improperly relied on the EJP and the doctrine of tribal sovereignty; (4) the Commission misapplied the law in granting a conditional concurrence; and (5) substantial evidence did not support a finding that the hotel will have adequate fire protection services. The Commission opposed the petition.

Following a hearing, the trial court denied the petition. With respect to the hotel's visual impact, the court found that HARP failed to

5

administratively exhaust its argument that the wrong legal standard was used and that the Commission stated the basis for its action in sufficient detail to allow its staff to prepare revised findings. The court also held that the Commission did not apply the EJP or the doctrine of tribal sovereignty in making its consistency decision and did not abuse its discretion by issuing a conditional concurrence. Finally, the court found that HARP forfeited any challenge to the adequacy of fire protection services by failing to present all relevant evidence in its opening brief. As a result, the court did not address the merits of that argument. HARP timely appealed.[3]

## II. **DISCUSSION**

### A. Standard of Review

A decision by the Commission may be challenged by a petition filed under Code of Civil Procedure section 1094.5. (§ 30801.) As relevant here, the inquiry is "whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [Commission] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) When the findings are challenged for insufficient evidence, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (*Id.*, § 1094.5, subd. (c).)

"The trial court presumes that the agency's decision is supported by substantial evidence, and the petitioner bears the burden of demonstrating

---

[3] We grant HARP's unopposed request for judicial notice. We, however, note that HARP may cite a publication like the Federal Register without requesting judicial notice. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 ["A request for judicial notice of published material is unnecessary. Citation to the material is sufficient"].)

the contrary." (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 (*McAllister*).)  The court does not substitute its own findings for that of the Commission; rather, "it is for the Commission to weigh the preponderance of conflicting evidence." (*Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 986.)  Thus, the court "may reverse [the Commission's] decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." (*Ibid.*)  Finally, the court must resolve all doubts in favor of the Commission's findings and decision.  (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.)

On appeal, "our role is identical to that of the trial court." (*McAllister*, *supra*, 169 Cal.App.4th at p. 922.)  We therefore independently determine whether substantial evidence supports the Commission's findings.  (*Ibid.*)  We also review questions of law de novo.  (*Id.* at p. 921.)

B.  <u>Visual Impact</u>

To protect the views along coastal areas, section 30251 states in pertinent part that "[p]*ermitted development* shall be sited and designed . . . to be *visually compatible* with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas.  *New development in highly scenic areas* . . . shall be *subordinate* to the character of its setting." (Italics added.)  Accordingly, different visual standards apply depending on whether the proposed project is a "permitted development" or a "new development in highly scenic areas."  HARP contends that the Commission violated section 30251 because it failed to apply the "subordinate" standard or state in sufficient detail the basis for its rejection of staff's recommendation as to visual compatibility.  We disagree.  HARP failed to exhaust its administrative remedies as to its "subordinate"

7

standard contention, and the Commission stated the basis for its action in sufficient detail.

      1.  Exhaustion of Administrative Remedies.

HARP argues that the Commission improperly applied the "visually compatible" standard in finding the hotel project consistent with section 30251. According to HARP, the Commission should have applied the stricter "subordinate" standard because the proposed hotel is a "new development" in a "highly scenic" area. (§ 30251.) The Commission counters that HARP's argument is barred because it failed to exhaust its administrative remedies by raising this issue with the Commission during the administrative proceeding. We agree and find that no exception to the exhaustion rule applies here.

"When remedies before an administrative forum are available, a party must in general exhaust them before seeking judicial relief. [Citation.] Exhaustion requires 'a full presentation to the administrative agency upon all issues of the case and at all prescribed stages of the administrative proceedings.' " (*City of San Jose v. Operating Engineers Local Union No. 3* (2010) 49 Cal.4th 597, 609.) The requirement to exhaust administrative remedies is not a matter of judicial discretion but a jurisdictional prerequisite. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 321.) However, "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a court proceeding because the parties are not generally represented by counsel before administrative bodies." (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1105 (*Save the Hill*).) Nonetheless, the *exact* issue must still be presented so the agency is fairly apprised of the purported defect. (*Id.* at p. 1104.)

8

Here, HARP never argued before the Commission that the proposed hotel must be "subordinate to the character of its setting." (§ 30251.)  Yet, HARP contends that it "fairly apprised" the Commission of its position based on:  (1) its comment letter for the August 2019 hearing, which states that section 30251 applies; and (2) its comment at the August 2019 hearing that the site of the hotel "deserves the highest level of scenic protection."  Neither comment, however, fairly apprised the Commission of which legal standard under section 30251 should apply.  First, HARP's general reference to section 30251, the governing statute, does not, in any way, indicate whether the "subordinate" standard, rather than the "visually compatible" standard, should apply.  Second, HARP's desire for "the highest level of scenic protection" does not, in any way, indicate whether the hotel project should be deemed a "new development in a highly scenic area[]," and not just a "permitted development."  Finally, HARP *never* questioned the Commission's consistent application of the "visually compatible" standard throughout the hearings.  Under these circumstances, the failure of the Commission and its staff to consider the "subordinate" standard confirms that HARP did not fairly apprise the Commission of the issue.

HARP also references an attachment to the Commission's October 2018 letter to the BIA that outlines the policies relevant to a consistency determination.  The attachment recites section 30251 and states that the site of the hotel "is designated as a highly scenic area."  According to HARP, this attachment establishes that the Commission was "well aware" of the "subordinate" standard argument.  However, by the time of the administrative proceedings in 2019, it was clear that the Commission was solely focused on the "visually compatible" standard of section 30251.  For example, in its 2019 reports, Commission staff only considered whether the

9

hotel would be "visually compatible with the character of surrounding areas." At the June and August 2019 hearings, the Commission likewise only discussed whether the hotel would be "visually compatible" with its surroundings. As a result, we cannot conclude that the Commission was fairly apprised of HARP's "subordinate" standard argument based on the vague references in the attachment to section 30251 and the scenic nature of the hotel's surrounding areas.

We also cannot conclude that HARP exhausted its administrative remedies because it initially agreed with its staff's recommendation to object to the BIA's consistency determination based on the hotel's visual impacts. As discussed above, both staff's recommendation and the Commission's rejection of that recommendation *only* applied the "visually compatible" standard. (See, *ante*, at p. 9.) HARP had numerous opportunities to tell both staff and the Commission that they were using the wrong legal standard. But HARP never did so.

Alternatively, HARP argues that it was excused from satisfying the exhaustion rule under the "pure legal issues" and futility exceptions. We disagree. Admittedly, the rule of exhaustion generally does not apply to questions of law. (*Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181, 1199, fn. 7.) But whether the hotel is a "new development" in a "highly scenic area" and therefore subject to the "subordinate" standard is a mixed question of fact and law. To apply that standard, the Commission must make factual determinations, including whether the hotel should be considered a "new development" and whether a local coastal program or the California Coastline Preservation and Recreation Plan has designated the site of the hotel a "highly scenic area" for purposes of section 30251. Most notably, whether the proposed hotel is "subordinate to the character of its

10

setting" presents a factual issue.  (§ 30251.)

Nor does the futility exception apply.  That exception "applies only if the party invoking it can positively state that the administrative agency has declared what its ruling will be in a particular case."  (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1313.)  Thus, HARP can only avail itself of the exception if it can show that the Commission had " 'predetermined its position as to' the issue in question."  (*Id.* at p. 1314.)  HARP contends that it has done so because "too many Commissioners expressed a misplaced allegiance to tribal sovereignty and the EJP instead of the Coastal Act" at the hearings.  But as discussed below, the Commission based its consistency determination on the Coastal Act, and the record does not establish that it had predetermined its position just because it found that the "visually compatible" standard was met.  And even if the outcome would have been the same had HARP raised the issue below, the Commission would undoubtedly have explained why it believed that the "subordinate" standard was met in findings that we could review.

*Save the Hill, supra*, 76 Cal.App.5th 1092, does not support HARP's futility argument.  In *Save the Hill*, we applied the futility exception because even if the petitioner had raised a "no-project alternative" challenge, "the evidence was overwhelming" that the result would have been the same because councilmembers "were advised by staff and attorneys that it was too late" to consider such an alternative and that consideration of that challenge "would expose the City to liability under the takings clause."  (*Id.* at p. 1108.)  No similar evidence exists here.  Indeed, HARP identifies nothing in the record that would have dissuaded the Commission from applying the "subordinate" standard had HARP raised it.  Accordingly, we find that HARP cannot raise that standard for the first time on appeal.

11

2.  Sufficiency of the Commission's Stated Basis for Its Decision.

HARP next argues that the Commission abused its discretion by failing to state the basis for its decision that the hotel project was "visually compatible" with the hotel's surroundings in sufficient detail. We are not persuaded.

California Code of Regulations, title 14, section 13096, subdivision (b) states in relevant part: "If the commission action is substantially different than that recommended in the staff report, the prevailing commissioners shall state the basis for their action in sufficient detail to allow staff to prepare a revised staff report with proposed revised findings that reflect the action of the commission." This ensures that " 'the commissioners layout the analytic route for their decision *before* the approval occurs' " so that " 'the revised findings are then not post hoc rationalizations' " but an accurate reflection of the Commission's rationale at the time of approval. (*Friends, Artists & Neighbors of Elkhorn Slough v. California Coastal Com.* (2021) 72 Cal.App.5th 666, 704 (*Friends*).)

The Commission contends that HARP forfeited this argument by failing to raise it during the administrative proceeding. We disagree. After the Commission voted for a conditional concurrence in August 2019, its staff prepared revised findings. Before the Commission approved these revised findings, HARP submitted a comment letter in September 2019, stating that the findings did not "assess the visual impacts of the proposed hotel." The Commission argues that HARP only "challenged the adequacy of staff's proposed revised findings," and *not* the adequacy of the Commission's basis for these findings. But the revised findings are only adequate if they reflect the Commission's stated rationale at the hearing. Thus, by challenging the adequacy of the findings as to the hotel's visual impact, HARP's comment

12

fairly apprised the Commission of its argument that the Commission did not state the basis for those findings in sufficient detail. (*Friends*, *supra*, 72 Cal.App.5th at p. 622; see also *Save the Hill*, *supra*, 76 Cal.App.5th at p. 1105 ["less specificity is required to preserve an issue for appeal in an administrative proceeding"].) Indeed, there is nothing in the record to suggest that the Commission thought otherwise.

Turning to the merits, we find that the prevailing commissioners "state[d] the basis for their action in sufficient detail to allow staff to prepare" revised findings that the hotel would be "visually compatible" with its surroundings under section 30251. (Cal. Code Regs., tit. 14, § 13096, subd. (b).) At the August 2019 hearing, the prevailing commissioners explained why they believed that the hotel would be visually compatible. After reviewing simulations submitted by the Tribe to show what the hotel would look like from various vantage points, Commissioner Howell concluded that "the only views that are affected . . . are from the Trinidad Head which . . . is also the tribe's property." He further explained, "I've been to the Trinidad Head. I've done the hike. The simulations show that there [are] *no view impacts*." (Italics added.) Commissioners Padilla and Brownsey agreed that they too were not concerned about the visual impacts of the hotel.

Later, the Commission considered and rejected a motion to revise the hotel's design (including limiting its height) as a condition. In explaining why he opposed the motion, Commissioner Padilla explained that he "looked at what other structures exist in the immediate surroundings of the site [including the casino] and the juxtaposition of the current facility with respect to the bay" and did not believe that the proposed hotel "rises to the level of substantially blocking views to the bay or to the coast." He therefore

13

concluded, "I do not believe [the hotel] is inconsistent with" section 30251.

Staff's revised findings incorporated those comments and explanations. For example, the findings stated that "although the hotel would be significantly taller . . . than existing development" in the area, it "would be clustered with other commercial development" and therefore "would still be visually compatible with the character of the surrounding area." They also stated that the hotel "will not block views to or along the ocean from surrounding public viewpoints" and that "several aspects of the hotel combine to protect views from the Trinidad Head and . . . scenic and visual qualities of the area." In support, the findings cite the simulations provided by the Tribe. Thus, the prevailing commissioners provided staff with enough information to prepare revised findings that reflected their actions.

*Friends*, *supra*, 72 Cal.App.5th 666, is distinguishable. There, the Commission, against staff's recommendation, approved a coastal development permit application. (*Id.* at pp. 683–684.) The Commission did not, however, "consider project alternatives, mitigation measures, and conditions for the project *before* approving the . . . application" as required. (*Id.* at p. 703.) The Court of Appeal therefore concluded that the prevailing commissioners failed to state the basis of their action in sufficient detail. (*Ibid.*) By contrast, the prevailing commissioners in this case did consider and discuss the visual impact of the proposed hotel, including the simulations provided by the Tribe, before conditionally concurring with the BIA's consistency determination. Further, the prevailing commissioners in *Friends* incorporated modifications proposed by the developer *at* the hearing on the revised findings, reasoning that the modifications accurately reflected their thought processes when they approved the project. (*Id.* at pp. 687–688.) But the Court of Appeal held that these modifications were improper

14

because they were not mentioned at the time of approval.  (*Id.* at pp. 704–705.)  By contrast, the prevailing commissioners in this case approved the revised findings without any modifications.

Accordingly, we find that the prevailing commissioners stated the basis for their rejection of its staff's recommendation in sufficient detail.

C.  EJP and Trial Sovereignty

HARP contends that the Commission abused its discretion by relying on policies not found in the Coastal Act—specifically, the EJP and the doctrine of tribal sovereignty—to support its finding that the visual requirements of section 30251 were met.  We find no abuse of discretion.

The Commission adopted the EJP with the goal of "provid[ing] guidance and clarity . . . on how the Commission will implement its recently enacted environmental justice authority including how it will consider environmental justice in coastal development permits.  [Fn. omitted.]" Consistent with this goal, the Commission's revised findings included a standalone "Environmental Justice" section.  In that section, the Commission explained that its conditional concurrence will not only assist the Tribe "in achieving [its] goals," it will *also* "ensure that the hotel will be consistent with Chapter 3 standards of the Coastal Act."  Then, in a different section titled "Scenic and Visual Resources"—which does not mention the EJP or tribal sovereignty—the revised findings explain why the hotel complies with the "scenic and visual" requirements of section 30251.  Thus, the revised findings make clear that the Commission did not consider the EJP or tribal sovereignty in determining that the hotel project complied with section 30251.  Indeed, the findings expressly stated that the "standard of review for this project is consistency with the enforceable policies of . . . the Coastal Act."

15

HARP nevertheless contends that the Commission improperly relied on the EJP based on the following facts. In June 2019, the Tribe stated in a letter to the Commission that its objection "may be construed as contrary to [the Commission's] very own principles of environmental justice." In an addendum to its report, staff responded that "the Commission's actions in furtherance of environmental justice goals must be undertaken *in accordance with the resource protection policies of Chapter 3 of the Coastal Act*." (Italics added.) At the August 2019 hearing, staff confirmed that "current law doesn't allow us to afford any different analysis, even given the tribe's sovereignty." Commissioner Padilla then commented that he was "very sensitive to the sovereignty question" and that although "the standards certainly don't change, [] the way in which we interpret facts or circumstances to apply those standards [] do change." He continued that he was "willing, in light of the backdrop of the sovereignty issue, to give the [Tribe], certainly, a lot more leeway in making those determinations."

Shortly after Commissioner Padilla's comments, the Commission's then-Executive Director advised that the standard "is consistency with the Coastal Act" and that "[y]ou can use environmental justice in consideration of these decisions but, ultimately, the standard of review is the Coastal Act." In response, Commissioner Padilla agreed but added "that sometimes, depending on the different circumstances . . . there isn't a but after [environmental justice], and it is as legitimate a consideration, based on the statute, as some of the others, because it is part of the law." He then explained why he did not believe that the hotel would substantially block any coastal views. Several other commissioners also highlighted tribal sovereignty during the hearing.

Based on the colloquy described above, HARP argues that there were simply "too many references to tribal sovereignty and the EJP to find that they played no part in the [Commission's] decision." We disagree. First, it is the *written* findings that determine "the grounds on which the decision of the Commission rests and thus render its legality reasonably and conveniently reviewable on appeal." (*McAllister*, *supra*, 169 Cal.App.4th at p. 941.) Thus, oral comments made by select commissioners (primarily Padilla) at a hearing that may conflict with the written findings ultimately approved by the Commission are not relevant. That is especially so where, as here, the oral comments were made at the hearing that *preceded* the hearing in which the Commission approved those findings.

Citing two cases, HARP claims that oral comments are relevant and must be considered. But both cases are distinguishable. In *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, the trial court remanded a matter to the city council so it could determine whether an environmental impact report (EIR) was required but ordered the council to follow the wrong standard. (*Id.* at p. 82.) Our Supreme Court held that the council's resolution not to require an EIR was defective because the council applied the wrong standard imposed by the trial court. (*Ibid.*) In confirming that the council did, in fact, apply that standard, the high court noted that several council members "explicitly phrased their determination in terms of the trial court's test." (*Id.* at pp. 86–87.) In this case, however, the revised findings establish that the Commission applied the correct standards, rendering the oral comments irrelevant.

In *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, the city council affirmed the denial of a conditional use permit, and the clerk prepared a one-sentence memorandum justifying the denial. (*Id.* at p. 966.)

17

The trial court found that the findings in the memorandum were not supported by substantial evidence and set aside the council's decision. (*Id.* at p. 967.) The Court of Appeal reversed, holding that there "were other reasons given by the council members which were not specifically articulated in the memorandum" (*id.* at p. 970) and which justified the denial of the permit (*id.* at p. 971). In reaching this holding, the Court of Appeal used oral comments at the hearing to fill gaps in the written findings. In this case, however, the written findings adequately stated the grounds for the Commission's decision. We therefore need not look any further.

But even if we did consider the oral comments, we still would not find an abuse of discretion. Although Commissioner Padilla commented that he was willing to give the Tribe "a lot more leeway" in light of "the sovereignty issue," he also stated that he was not "all that concerned about the issues of inconsistency that have been identified by the staff with respect to those standards." He also agreed that the standard was consistency with the Coastal Act and explained why he did not believe that the hotel violated the visual requirements of section 30251. Thus, Padilla's comments indicate that he based his consistency conclusion on the Coastal Act and not the EJP or tribal sovereignty. And to the extent that his comments are ambiguous, his approval of the revised findings eliminate any such ambiguity. The same is true for the other commissioners who approved the revised findings.

Finally, *Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1349, does not compel a contrary conclusion. In that case, the Commission imposed several conditions that "were premised on the erroneous theory that section 30251 . . . protected public views from the ocean to the land" even though there is no such policy under section 30251. By contrast, the Commission did not impose any conditions premised on the EJP

or tribal sovereignty in this case. We therefore find that the Commission did not improperly base its decision on any policies not found in the Coastal Act.

D. Conditional Concurrence

HARP next argues that the Commission failed to proceed in a manner required by law because a conditional concurrence was not "procedurally proper." In support, HARP relies on two extrinsic documents: (1) the National Oceanic and Atmospheric Administration (NOAA)'s response to comments on its regulations implementing the CZMA; and (2) the Commission's published guide, "Federal Consistency in a Nutshell" (Nutshell). We disagree.

Part 930.4 of title 15 of the Code of Federal Regulations (part 930.4 or 15 C.F.R. § 930.4) expressly authorizes the Commission to "issue[] a conditional concurrence" with a federal action like the BIA's consistency determination (15 C.F.R. § 930.4, subd. (a)) and sets forth what must be done if a conditional concurrence is issued (*id.* subds. (a)(1)–(3)). The regulation does not, however, impose any prerequisites before a conditional concurrence may be issued. Thus, the Commission did not abuse its discretion in issuing one.

HARP counters that part 930.4 is ambiguous because "the term 'conditional concurrence' is semantically very similar to the phrase 'approved the conditions,' something that local agencies and the Commission frequently do in reviewing *non-federal* projects." (Italics added.) HARP's argument based on this ambiguity is less than clear. But it appears to be arguing that because of this ambiguity, the commissioners, in issuing a conditional concurrence, mistakenly believed that they were imposing

19

conditions on the hotel project that they could enforce.[4]  In support, HARP points to comments made by Commissioner Howell at the August hearing and argues that he mistakenly believed that granting a conditional concurrence was the same as approving a project with conditions.

But HARP does not explain how such a mistaken belief establishes that the Commission failed to proceed in a manner required by law.  Indeed, the language of part 930.4 is not ambiguous; it imposes *no* prerequisites for issuing a conditional concurrence.  That the commissioners may not have fully understood the difference between a conditional concurrence and an approval with conditions does not appear to establish one of the limited circumstances in which an abuse of discretion may be found under Code of Civil Procedure section 1094.5.

In any event, there is ample evidence that the Commission understood the import of a conditional concurrence when it approved the revised findings.  Those findings, and not the oral comments of an individual commissioner, constitute the Commission's action.  (See, *ante*, at p. 16.)  And those findings set forth the correct standard for a conditional concurrence under part 930.4.  Moreover, nothing in those findings suggests that the Commission ignored that standard.  Indeed, Commissioner Howell approved those findings at a hearing that occurred *after* the hearing in which he made the comments at issue.  Thus, he must have believed that his comments at the earlier hearing were consistent with the discussion of part 930.4 in the revised findings.

Our consideration of the two extrinsic documents that HARP references

---

[4] If the BIA adopts the condition proposed by the Commission, only the BIA, but not the Commission, may enforce that condition.  (See *New York v. DeLyser* (W.D.N.Y. 1991) 759 F. Supp. 982, 987.)

does not change our conclusion.

The first document referenced by HARP is an excerpt from the response of NOAA, the federal agency charged with implementing the CZMA, to comments on revisions to its own regulations implementing the CZMA.  (65 Fed. Reg. 77127 (Dec. 8, 2000).)  The excerpt explained why an objection may be more preferable than a conditional concurrence:  "Once a State agency has concurred, even with conditions, the [] agency retains no further consistency authority over the project."  This is significant because the "CZMA does not require a Federal agency to adopt a State's conditions of concurrence" or take any enforcement action if it issues an approval but the applicant later does not comply with the conditions.  But "[i]f a State agency objects, then [it] retains its authority over the project" and "the Federal agency . . . may not be able to proceed with a Federal agency activity."  NOAA noted, however, that "[s]ome States still prefer conditional concurrences, presumably as a more positive response to an applicant or Federal agency" and that "States have a choice of choosing either option on a case by case basis."

The second document referenced by HARP is the Nutshell published by the Commission.  According to HARP, the Commission revised the Nutshell in January 2001 to reflect NOAA's response described above.  With respect to conditional concurrences, the Nutshell stated:  "Where there are significant concerns about a federal activity, permit, or assistance, the Commission is *likely* to continue, as it has in the past, to object to the submittal rather than to issue a conditional concurrence.  Conditional concurrences will be limited to situations where relatively minor project modifications are necessary to bring a project into consistency with an enforceable policy of the [state coastal management program]."  (Italics

21

added.)

HARP contends that the Commission must give deference to NOAA's and its interpretation of the federal regulations and "was not free to ignore" them. HARP accordingly argues that the Commission acted unlawfully in issuing a conditional concurrence because identifying an adequate water supply was *not* a minor project modification. HARP, however, reads far too much into these two documents.

As a threshold matter, it is not clear how much deference should be given to the documents. In *Auer v. Robbins* (1997) 519 U.S. 452, 461 (*Auer*), the United States Supreme Court held that courts should defer to a federal agency's interpretation of its own regulation unless " ' "plainly erroneous or inconsistent with the regulation." ' " And just five years ago, the high court in *Kisor v. Wilkie* (2019) 588 U.S. 558, 563 (*Kisor*), reaffirmed that "*Auer* deference retains an important role in construing agency regulations." But more recently, that same court appeared to cast doubt on the viability of *Auer* deference in *Loper Bright Enterprises v. Raimondo* (2024) 144 S.Ct. 2244, 2263 (*Loper*). In *Loper*, the high court overruled *Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.* (1984) 467 U.S. 837, holding that "courts need not and . . . may not defer to an agency interpretation of the law simply because a statute is ambiguous." (*Loper*, at p. 2273.)

Although *Loper* did not expressly overrule *Auer* and *Kisor*, its reasoning is arguably irreconcilable with *Auer* deference. (See *United States v. Boler* (4th Cir. 2024) 115 F.4th 316, 322, fn. 4 ["The Supreme Court's recent ruling in [*Loper*] calls into question the viability of *Auer* deference"]; *Friends of the Floridas v. United States Bureau of Land Management* (D.N.Mex., Aug. 27, 2024, No. CIV 20-0924) 2024 WL 3952037, *93, fn. 59 ["Although the Supreme Court did not overrule or alter *Auer* deference in

*Loper* [], and the Supreme Court declined to overrule *Auer* just five years ago, . . . the basic principles that purport to underlie *Auer* and—formerly— *Chevron* deference are conceptually similar in that both involve administrative law's judicial deference to agency interpretations of law, and thus both are susceptible to constitutional criticisms"].)  Finally, it is not clear what, if any, deference should be accorded to a *state* agency's interpretation of a *federal* regulation.  (Cf. *Land v. Anderson* (1997) 55 Cal.App.4th 69, 81–82 [declining to accord deference to a state regulation interpreting a federal statute], overruled by statute on another point.)

Fortunately, we do not have to determine the amount of deference to be given to the two documents referenced by HARP because part 930.4 is not ambiguous.  It establishes *no* requirements that must be met before the Commission may issue a conditional concurrence.  (See *Kisor*, *supra*, 588 U.S. at p. 575 ["a court should not afford *Auer* deference unless the regulation is genuinely ambiguous"].)

But even if we accorded the highest level of deference to NOAA's response or the Commission's Nutshell, neither document supports a finding of abuse of discretion.  At most, the documents suggest that an objection should be the preferred option; they do not limit the Commission's discretion to issue a conditional concurrence.  For example, NOAA observed that some state agencies "still prefer conditional concurrences" over an objection and made clear that state agencies "have a *choice* of choosing either option on a case by case basis."  (Italics added.)  Similarly, the Nutshell stated that "the Commission is *likely* to continue . . . to object" to a project if "there are significant concerns about a federal activity."  (Italics added.)  In other words, the Commission, in its discretion, may issue a conditional

23

concurrence even if significant concerns exist.[5]

Accordingly, the Commission did not abuse its discretion by issuing a conditional concurrence.

E. <u>Fire Protection Services</u>

Lastly, HARP argues that no substantial evidence supports a finding of adequate fire protection services and that the Commission failed to make such a finding in writing. Although we find that the Commission made the requisite written finding, we agree with HARP that there is insufficient evidence to support that finding.

1. <u>Relevant Background</u>

At the August 2019 hearing, the Commission considered the adequacy of public services for the hotel. With respect to fire protection services, staff identified "cooperative agreements between the City of Trinidad, some of the other . . . volunteer fire departments in the area, as well as CalFire, who has a station nearby." Its staff, however, noted that "the closest hook and ladder-type of equipment . . . would be down here in the Arcata/Eureka area" and that "[w]hat is available up there, including with CalFire," is equipped to handle a residential or smaller structural fire—and not a fire in a multi-

---

[5] Although the next sentence in the Nutshell states that the Commission will not issue a conditional concurrence if non-minor "project modifications are necessary to bring the project" into compliance with the Coastal Act, that sentence is qualified by the preceding sentence discussed above. Moreover, HARP does not point to anything in the record suggesting that a non-minor modification will be necessary to ensure an adequate water supply. Finally, the concern raised by the Commission's then-Executive Director about issuing a conditional concurrence in light of the water supply issue at the June 2019 hearing has no bearing on whether the Commission acted lawfully. In any event, the Director did not raise that concern again at the August hearing in which the Commission voted for a conditional concurrence.

story structure like the proposed hotel. The Tribe's CEO acknowledged that the closest ladder truck was in Arcata but stated that the Tribe planned to partner with CalFire and "apply[] for grants to go after a ladder truck for the Trinidad area."

Following this testimony, Commissioner Wilson moved to include adequate fire protection services as a second condition to the concurrence (in addition to adequate water supply). In response, the Tribe's CEO stated, "We have preliminary agreements, verbally, with CalFire." The CEO then stated that by proposing this condition, the Commission was "really questioning the tribe's integrity of providing fire [protection services]" and that "for insurance reasons, we have fire hydrants, we have fire protection, [] we do everything right, [] and the building will have sprinkler systems, all of that." In response, Commissioner Wilson withdrew his motion. The revised findings made no mention of fire protection services.

### 2. Inadequacy of Fire Protection Services

The Commission argues, as a threshold matter, that HARP forfeited its challenges to the adequacy of fire protection services for the hotel. According to the Commission, HARP did not: (1) argue that the Commission had to make written findings as to fire protection services until its reply before the trial court; or (2) present "all material record evidence" on fire protection services to the trial court. But HARP did raise the issue of inadequate fire protection in its opening memorandum of points and authorities. And HARP's evidentiary omissions before the trial court did not result in an unduly unfair presentation of the relevant evidence. Because HARP did raise the issue below and because the adequacy of fire protection services is an important public safety issue, we exercise our discretion to consider it here. (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191,

25

1211 ["The principles underlying forfeiture of claims on appeal may yield when matters involving the public interest or the due administration of justice are implicated"].)

Turning to the merits, we conclude that the Commission's finding of adequate "public services" under section 30250, reasonably includes a finding that there are adequate fire protection services. (See *Curtis v. Board of Supervisors* (1972) 7 Cal.3d 942, 961.) But we further conclude that there is insufficient evidence to support that finding.

Section 30250, subdivision (a) requires that a proposed project "be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with *adequate public services* and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources." (Italics added.) Although section 30250 does not define "public services," they are commonly understood to include fire protection services. (See, e.g., *Zack v. Marin Emergency Radio Authority* (2004) 118 Cal.App.4th 617, 637 ["District is statutorily authorized, as are all community service districts, to provide a myriad of public services, including those relating to fire . . . protection"]; *Levinsohn v. City of San Rafael* (1974) 40 Cal.App.3d 656, 659 [identifying "fire protection" as "public services"].) The Commission does not dispute this.

Here, the Commission's revised findings confirm that section 30250 applies here. They also state that "to bring the proposed project into consistency with [this section] . . . the BIA would need to modify the [] project to include" evidence of an adequate water supply prior to construction. Because the Commission only identified one concern with the public services for the hotel project—the adequacy of the water supply—the

26

Commission necessarily found that all other public services for the project, including fire protection services, were adequate.[6] (See *San Diego Navy Broadway Complex Coalition v. California Coastal Com.* (2019) 40 Cal.App.5th 563, 588 [declining to require an express finding where "nothing in the regulation" required one].)

Nonetheless, we agree with HARP that there is insufficient evidence to support such a finding as to fire protection services. The record did establish that the City of Trinidad, the nearest entity that could provide firefighting services at the hotel, had "cooperative agreements" with "volunteer fire departments in the area" and with CalFire. But the proposed hotel—which will have 100 rooms— has at least two more stories and is 30 feet taller than the next tallest building in the surrounding area. And according to the staff of the Commission, the closest hook and ladder truck equipped to fight a fire in a five-story building as tall as the hotel is located in Arcata, roughly 15 miles south of the hotel.[7] If a fire broke out at the hotel while Arcata's one

---

[6] The Commission argues that any "impact to the coastal zone from a fire at the hotel is speculative." We disagree. The proposed hotel is "located near the top of a coastal bluff" and a scenic drive and is less than 1500 feet from the coastline. The area surrounding the hotel "is relatively undeveloped and features redwood trees and a variety of coastal vegetation." The Commission also does not dispute that the proposed hotel will affect coastal resources—which makes the CZMA applicable. (16 U.S.C. § 1452(5).) Finally, as acknowledged by the Commission at oral argument, the only reason the site of the hotel falls outside the coastal zone is "because of its Federal trust status." Given the inherent risk of a fire at the hotel spreading as well as the potential effect of any smoke from that fire on the plants and wildlife in the immediately adjacent coastal areas, the impact of a fire at the hotel to the coastal zone is more than sufficiently foreseeable to require consideration of fire protection services as part of section 30250.

[7] To the extent that there are hook and ladder trucks in McKinleyville or Eureka available to fight a fire at the hotel, those trucks would be approximately 10 and 23 miles away, respectively. We take judicial notice of

27

ladder truck was needed elsewhere, there would presumably be no other ladder truck readily available.[8]  Staff also noted that the fire protection equipment available to CalFire was more suited to fighting a residential or smaller structural fire–and not a fire at a five-story hotel.

Even if CalFire was equipped and willing to fight a fire at the hotel, the Tribe only represented that "[w]e have *preliminary* agreements, *verbally*, with CalFire."  (Italics added.)  The Tribe further acknowledged that "[w]e haven't circled back to CalFire."  Although we do not doubt the sincerity of the Tribe's representations or intentions, this vague assertion of a preliminary, verbal agreement with CalFire simply does not constitute substantial evidence of adequate fire protection services.  (*County of San Diego v. Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 555 ["substantial evidence has been defined in two ways:  first, as evidence of ' " 'ponderable legal significance . . . reasonable in nature, credible, and of solid value' " ' [citation]; and second, as ' "relevant evidence that a reasonable mind might accept as adequate to support a conclusion" ' "].)  Moreover, the presence of fire hydrants, sprinkler systems, and other fire protection at the hotel does not answer the question of whether there would be anybody qualified, equipped, and available to combat a fire, should one erupt at the five-story hotel.  Based on the record before us, we do not find substantial evidence of adequate fire protection services for the proposed hotel as required by section 30250, subdivision (a).

---

the approximate driving distance between Trinidad Rancheria and Arcata, McKinleyville, and Eureka.  (Evid. Code, § 452, subd. (h).)

[8] Eureka has buildings similar in height to the proposed hotel.

### III.  **DISPOSITION**

The judgment is reversed in part.  The matter is remanded, and the trial court is directed to issue a peremptory writ commanding the Commission to reconsider whether the proposed project is consistent with section 30250 with respect to fire protection services.  The Commission may, on remand, consider any additional evidence of fire protection services that either party wishes to present.  In all other respects the judgment is affirmed.  Both parties shall bear their own costs.

CHOU, J.

We concur.

SIMONS, Acting P. J.

BURNS, J.

(A169773 – *Humboldt Alliance for Responsible Planning v. California Coastal Commission*)

29

Filed 12/20/24

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| HUMBOLDT ALLIANCE FOR RESPONSIBLE PLANNING,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA COASTAL COMMISSION,<br><br>    Defendant and Respondent;<br><br>BUREAU OF INDIAN AFFAIRS,<br><br>    Real Party in Interest. | A169773<br><br><br>(Humboldt County<br> Super. Ct. No. CV190866)<br><br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION AND MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:*

The opinion in the above entitled matter filed on November 25, 2024, was not certified for publication in the Official Reports. For good cause appearing, pursuant to California Rules of Court, rules 8.1105(b)–(c) and 8.1110, the opinion is certified for partial publication. Accordingly, respondent's request for publication is GRANTED IN PART.

It is ordered that the opinion filed herein on November 25, 2024, be modified as follows: On page 1, after the header notifying certification for partial publication, the following unnumbered, asterisk footnote is added: "Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B and E of the Discussion and the Disposition."

The modification makes no change to the judgment.


Dated: <u>  12/20/2024  </u>      <u>  Simons, J.  </u>, Acting, P. J.

_____

\* Simons, Acting P. J.; Burns, J.; Chou, J.

1

Trial Court:        Superior Court of the County of Humboldt

Trial Judge:        Timothy Canning

Counsel:            J. Bryce Kenny for Plaintiff and Appellant.

                    Rob Bonta, Attorney General, Daniel A. Olivas, Assistant
                        Attorney General, and David G. Alderson, Deputy
                        Attorney General, for Defendant and Respondent.

                    No appearance for Real Party in Interest.