Filed 6/9/26  Ruby Falls Fund v. Ainsworth CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RUBY FALLS FUND, LLC, Plaintiff and Appellant, v. JACK AINSWORTH et al., Defendants and Respondents. | H053262 (Monterey County Super. Ct. No. 20CV000165) |

This appeal arises from a petition for writs of mandate and administrative mandate by Ruby Falls Fund, LLC (Ruby Falls) against the California Coastal Commission (Commission) over the transfer, issuance, and extension of a coastal development permit (CDP or permit) for Ocean View Plaza, a development project on historic Cannery Row in Monterey.

In 2008, based on an application submitted by a previous owner, the Commission conditionally approved a CDP for Ocean View Plaza for a mixed-use development proposal consisting of commercial, residential, and retail spaces, a pedestrian bridge, a history center, and a desalination plant.  The CDP contained both standard and special conditions, including one special condition whose fulfillment was a necessary precondition to issuance of the permit (prior-to-issuance condition).

In 2017, Ruby Falls purchased Ocean View Plaza and was drawn into a protracted legal dispute over ownership of the property. In 2023, an unpublished decision by a panel of this court finally resolved that dispute in favor of Ruby Falls, overruling a contrary decision by the trial court. (*Ruby Falls Fund, LLC v. AquaLegacy Development, LLC* (May 1, 2023, H048978, H049062, H049160, H049368) [nonpub. opn.] (*AquaLegacy*).)

Prior to resolution of the *AquaLegacy* litigation, Ruby Falls sought from the Commission both transfer and issuance of the CDP. Ruby Falls provided the Commission with documentary support for its contentions that it owned the property and had satisfied the permit's prior-to-issuance condition.

The Commission refused to transfer the permit to Ruby Falls, citing the ongoing uncertainty over the property's ownership. The Commission directed Ruby Falls to apply for an extension of the CDP, which Ruby Falls did while disputing the need for an extension. After a hearing, the Commission denied the extension because of changed circumstances that had arisen after the initial approval of the CDP. The changed circumstances identified by the Commission concerned the adequacy of the project's water supply and the effect of projected increases in sea level rise.

Ruby Falls brought an action for writ of mandate and writ of administrative mandate challenging, respectively, the Commission's refusal to transfer and issue the CDP, and its requirement for and subsequent denial of Ruby Falls's extension request. The trial court denied the petition for writ of mandate on transfer and issuance of the CDP and granted the writ of administrative mandate on one of three grounds asserted by Ruby Falls. The court ordered the Commission to set aside its denial of the extension request and to hold a new extension hearing.

In this court, Ruby Falls challenges the trial court's decisions on the petition for writs of mandate. Ruby Falls contends the trial court erred in denying its request for a traditional writ of mandate for the Commission to perform its ministerial duty to transfer and issue the CDP to Ruby Falls. Ruby Falls additionally maintains the court erred in rejecting its other asserted grounds for an administrative writ of mandate.

For the reasons explained herein, we reject Ruby Falls's challenges and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Facts

#### 1. 2008 Coastal Development Permit

In 2008, the Commission conditionally approved a CDP application by the original permittee, Cannery Row Marketplace, LLC, authorizing construction of a large, mixed-use, commercial/residential project at Ocean View Plaza on Cannery Row (the property). The proposed project consists of more than 87,000 square feet of commercial, residential, and retail space and an onsite desalination plant, with seaward intake/discharge components located offshore.

The CDP, as further amended in 2008, contains standard and special conditions, several which are relevant to this appeal. The CDP includes one prior-to-issuance condition (Special Condition 18) that requires the permittee to record a deed restriction against the property. The CDP also includes numerous prior-to-construction conditions requiring the submission and approval by the director of plans related to, inter alia, water supply, offshore intake/discharge plans, and other agency approvals. In addition, the CDP has standard conditions governing the commencement of development, expiration of the permit if development has not commenced, and

3

interpretation of the permit conditions (Standard Conditions 1, 2, and 3, respectively).

According to Standard Condition 2, the CDP would expire on August 7, 2010 (two years from the Commission's initial approval on August 7, 2008), unless the project commenced by that date. In response to the 2008 economic downturn, the Legislature passed a series of laws that provided automatic extensions of unexpired subdivision maps and related discretionary approvals like CDPs. These legislative actions extended the CDP expiration date to August 7, 2016.

### 2. 2016–2018 CDP Extensions and Ownership Dispute

By 2016, Cannery Row Marketplace, LLC, the original permittee, no longer owned the property, and a dispute regarding the ownership of the property had developed between two entities claiming ownership, AquaLegacy Development, LLC (AquaLegacy, LLC) and 2012 Canrow Owner, LLC.[1] They applied jointly to the Commission for sequential one-year CDP extensions in 2016 and 2017 pursuant to Standard Condition 2 and applicable regulations.

In its 2016 extension analysis, the Commission noted questions of changed circumstances pertaining to water supply. The Commission indicated that granting the extension would allow the applicants time to pursue the other required approvals related to the outstanding water supply questions "[a]nd to resolve the underlying ownership dispute." The Commission granted both extensions, resulting in a new CDP expiration date of August 7, 2018.

---

[1] A summary of the ownership dispute is set forth in this court's nonpublished opinion in *AquaLegacy*, *supra*, H048978, H049062, H049160, H049368.

4

In 2017, Ruby Falls purchased 2012 Canrow Owner, LLC's interest in the property. In an e-mail to Commission staff on August 21, 2017, Ruby Falls's principals introduced themselves to the Commission as "the new legal owners of the property and project" and included documentation "confirming [their] ownership." Staff responded that the Commission's understanding was that there were two lawsuits still pending between AquaLegacy, LLC and 2012 Canrow Owner, LLC, and "the ownership issue regarding the Ocean View Plaza property does not appear to be resolved."

Ruby Falls disputed this conclusion. It provided Commission staff with additional documents requested by the Commission, including a preliminary title report showing title had "vested in" Ruby Falls. In September 2017, pursuant to California Code of Regulations, title 14, section 13170, Ruby Falls submitted a request to assign permit and affidavit and provided supporting documentation, including a current policy of title insurance issued by First American Title Insurance Company, dated August 15, 2017, and a grant deed for the property, recorded on July 26, 2017, to Ruby Falls as grantee. Ruby Falls stated that it was prepared to sign and record the required deed restriction to satisfy Special Condition 18, which it believed was "the only condition required prior to issuance of permit."

Citing the litigation over disputed ownership of the property, the Commission responded it could not assign or issue the permit to Ruby Falls. Commission staff informed Ruby Falls that "[o]nce the ownership issue is resolved and it is clear who has legal title to the property, we will be able to move forward quickly to review and approve the GDR [generic deed restriction] documents and issue the CDP." While continuing to pursue Commission approval to transfer and issue the CDP, Ruby Falls obtained

5

from the City of Monterey (City) a two-year extension of city-level entitlements (use permit and tentative map).

In March 2018, after failing to persuade the Commission of its title to the property, Ruby Falls moved forward with execution and recordation of the deed restriction, thereby—in its view—satisfying the prior-to-issuance condition. By letter dated March 24, 2018, Ruby Falls informed the Commission of these actions and included copies of a certified copy of the deed restriction and preliminary title report reflecting its recordation.

The Commission responded by letter dated April 4, 2018, and reiterated that, due to the ongoing ownership dispute, it would not issue the CDP and "d[id] not intend[] to further assist with condition compliance on this matter unless and until the property ownership issues are resolved." The Commission observed that at least one of the lawsuits "is specifically an action to quiet title to the Ocean View Plaza property" and noted that AquaLegacy, LLC had provided the Commission "with conflicting title reports regarding ownership" of the project. The Commission explained, "Of course, Commission [s]taff is not in a position to resolve ownership disputes that are the subject of active litigation, but it is by no means clear to us that [Ruby Falls] is now the current record owner of the property in question."

The Commission advised Ruby Falls that Special Condition 18 "requires the landowner to record a deed restriction prior to issuance of the CDP. Given the above-identified ongoing disputes regarding which entity owns the property, it is unclear whether [Ruby Falls] has the right to so encumber the property. Thus, even though [Ruby Falls] has recorded a deed restriction against the property, Special Condition 18 has not yet been satisfied because Commission [s]taff cannot confirm whether [Ruby Falls] even has the legal right to record such a deed restriction, nor has Commission

6

[s]taff reviewed or approved execution and recordation of the deed restriction that was recorded, as is also required by Special Condition 18." The Commission further informed Ruby Falls that the City's approvals and initiation of a development agreement process with Ruby Falls "is not controlling on whether Commission [s]taff should issue the CDP . . . to [Ruby Falls]."

The Commission suggested that Ruby Falls take steps to ensure the CDP would not expire, including, if necessary, applying jointly with AquaLegacy, LLC for an extension, as Ruby Falls's predecessor had done. Jointly with AquaLegacy, LLC, Ruby Falls sought a CDP extension of the CDP, which was set to expire on August 7, 2018, until August 7, 2019.

While these discussions were occurring, between 2016 and 2018, Commission staff was discussing with other state agencies a recent change to the Water Quality Control Plan for the Ocean Waters of California (known as the Ocean Plan).[2] Commission staff, in consultation with the State Water Resources Control Board (SWRCB), Regional Water Quality Control Board (RWQCB), and California Department of Fish and Wildlife, sought to determine whether the desalination plant component of the project was consistent with the Ocean Plan Amendment. Because of the interagency discussions, Commission staff did not forward the CDP extension application to the Commission but instead stayed expiration of the CDP pending interagency discussions.

---

[2] In May 2015, the SWRCB adopted an amendment to the Ocean Plan to address effects associated with the construction and operation of seawater desalination facilities (the Ocean Plan Amendment). The Ocean Plan Amendment instituted updated seawater desalination requirements statewide.

Ruby Falls provided the Commission with additional documentation of ownership, including tax bills issued by the County of Monterey for the parcels that comprised the property and named Ruby Falls as the owner. Ruby Falls asserted that it had "submitted to [the Commission] documents which are normally accepted by the [] Commission to assign a permit and satisfy a deed restriction condition" and implored the Commission not "to evaluate claims in litigation for the purpose of rejecting otherwise standard documents." Ruby Falls argued that the Commission should perform its "ministerial duty" of issuing the CDP. In addition, Ruby Falls requested an interagency meeting with other agencies, including the SWRCB and the National Oceanic and Atmospheric Administration, about the required permits and entitlements and "how to implement the project in compliance with the Ocean Plan which became effective in 2016."

The Commission explained, in a letter dated June 4, 2018, that the information and documentation Ruby Falls provided was not dispositive of ownership as AquaLegacy, LLC had also submitted a title report (that postdated and contradicted Ruby Falls's title report), and the litigation over ownership remained pending. The Commission informed the agencies contacted by Ruby Falls that it believed that it would be premature to hold an interagency meeting until resolution of the ownership litigation.

3. 2019 CDP Extension Request Hearing and Denial

In August 2019, prior to the CDP's August 7, 2019 expiration date, Commission staff urged Ruby Falls to file a second request for extension and pay the related fee.[3] The Commission informed Ruby Falls that it intended

---

[3] Due to the stay of the 2018 joint extension request, the Commission later explained in its November 2019 staff report on the extension request that while there was only one substantive question before the Commission

to bring the extension request to hearing in November, at which time it would recommend that the Commissioners deny the request. The Commission cited "new restrictions on the permissibility of desalination facilities located within Marine Protected Areas (due to changes under the 2015 Ocean Plan Amendment)" as the basis for its recommendation that the Commission deny the extension on the ground of changed circumstances.

Jointly with AquaLegacy, LLC, Ruby Falls filed an extension request. Ruby Falls reserved its right to assert that the Commission had failed to perform its ministerial duties to approve assignment and issuance of the CDP, and that, but for that refusal, Ruby Falls would have satisfied Standard Condition 2 by commencing development before the August 7, 2018 CDP expiration, obviating the need for the additional extension request. Ruby Falls also repeatedly asked the Commission to continue the hearing because its principal was unable to attend the November hearing date.

The Commission issued a staff report on the extension request (staff report), with a hearing date set for November 13, 2019, recommending denial of the request due to changed circumstances. We discuss the changed circumstances findings of the staff report in our analysis, *post* (pt. II.C.2.b.).

Ruby Falls argued it had insufficient time to defend against denial of the extension. In addition, Ruby Falls urged that denial of the extension would effectively require a new permit application, with a filing fee of over $100,000 and updated approvals from the City. Ruby Falls argued there was no prejudice to the Commission if it were to briefly defer deciding the extension request, allow Ruby Falls "time to present its own case," and allow Monterey's city council to meet and consider the impacts of denying the

---

(whether to extend the CDP), "there [we]re actually two extension requests before the Commission."

9

extension on the long-awaited project. Ruby Falls maintained that the changed circumstances identified by the Commission could be addressed through the consideration of amendments to the CDP rather than opening the permit for de novo review.

In an addendum to the staff report, staff continued to recommend denial of the CDP extension, arguing that the applicants (Ruby Falls and AquaLegacy, LLC) had been on notice since August 2019 of the Commission's intent to recommend a finding of changed circumstances.

The Commission conducted the hearing on November 13, 2019. Commission staff presented the findings of the staff report. The Commission also received written submissions and public comment at the hearing, including from representatives of Ruby Falls, AquaLegacy, LLC, various public agencies, and members of the public. The Commissioners voted unanimously to adopt the recommendation of the staff report and deny the requested CDP extension.

*B. Procedural History*

On January 13, 2020, Ruby Falls filed a verified petition for writ of mandate in the Monterey County Superior Court (petition) against the Commission and its executive director, Jack Ainsworth, in his official capacity. The petition asserted two causes of action.

First, the petition sought a writ of mandate against Ainsworth, as the executive director, pursuant to Code of Civil Procedure[4] section 1085, alleging that Ainsworth "has clear, present, and ministerial duties to assign and issue the CDP to Ruby Falls, which as owner of the [p]roperty and [p]roject has a clear, present, and beneficial right to performance of said duties." The

---

[4] All further unspecified statutory references are to the Code of Civil Procedure.

petition asserted that although Ruby Falls had produced three distinct forms of proof of ownership (a grant deed, current policy of title insurance, and current tax bills) and satisfied the permit's last prior-to-issuance condition by recording the deed restriction, the director had refused to discharge his ministerial obligation to transfer and issue the CDP to Ruby Falls.

The petition also sought a writ of administrative mandate against the Commission pursuant to section 1094.5, challenging the lawfulness of the Commission's decision to require and then deny the CDP extension request. The petition alleged that the decision exceeded the Commission's jurisdiction "by purporting to deny an extension for a CDP that already had vested in Ruby Falls or whose expiration period had been tolled." Further, Ruby Falls argued the decision was the result of an unfair trial due to the timing of the hearing and the Commission's refusal to grant a postponement, and was not supported by substantial evidence under the relevant regulatory provision for changed circumstances.

In written arguments in support of the petition, Ruby Falls did not re-raise its unfair hearing claims but argued that no extension was necessary because Ruby Falls had already commenced the project under the terms of the CDP by "diligently perform[ing] all acts necessary to carry out the conditions of the permit," meaning the CDP had not expired and/or the permit had already vested. Ruby Falls alternatively argued that if the trial court were to decide it had not commenced the project, the equitable principles of tolling and/or estoppel would operate to prevent the CDP's expiration, since the Commission had rejected Ruby Falls's three separate proofs of ownership and had "undermined every effort in 2017 and 2018 to move the [p]roject forward." Ruby Falls further asserted that denial of the extension based on "changed circumstances" had no basis in law or fact,

11

where the documents cited by the Commission as support for its findings were not part of the Coastal Act as required by the relevant regulatory provision (Cal. Code of Regs., tit. 14, § 13169, subd. (b)), and the purported changes in conditions were already known at the time of the CDP's prior extensions in 2016 and 2017.

The trial court stayed the action on the petition for all purposes pending resolution of the appeals in the *AquaLegacy* action. Those appeals resolved in May 2023, when a panel of this court overruled a contrary decision of the trial court and decided that Ruby Falls was the owner of the disputed Cannery Row parcels. (*AquaLegacy*, *supra*, H048978, H049062, H049160, H049368.) Following the *AquaLegacy* decision, on May 28, 2024, the trial court held a hearing on the writ causes of action.

In a detailed written order, the trial court denied relief as to Ruby Falls's traditional mandamus cause of action and denied most of the relief sought under the administrative mandate cause of action, granting relief only on the issue of unfairness of the hearing on the extension request.

As to the traditional writ of mandate cause of action, the trial court rejected Ruby Falls's claim that the director had a ministerial duty, under the governing regulation (Cal. Code of Regs., tit. 14, § 13170), to transfer the CDP to Ruby Falls if Ruby Falls provided certain documents identified in the provision on transfer of permits. The court reasoned that the regulatory provision confers discretionary authority on the director of the Commission to approve the transfer of a permit to a new landowner. The court found that the director in this case reasonably exercised his discretion "not to approve the documents submitted by Ruby Falls in support of the permit transfer because of the disputed ownership" of the property, which remained

contested until the appellate decision in *AquaLegacy*, *supra*, H048978, H049062, H049160, H049368.

As to the administrative mandate cause of action, the trial court rejected Ruby Falls's argument that the Commission exceeded its jurisdiction by requiring an extension of the CDP notwithstanding Ruby Falls's contention that development under the permit had already commenced. The court also rejected the application of equitable tolling and/or estoppel principles to bar expiration of the CDP or preclude the Commission from requiring an extension of the CDP.

Regarding the changed circumstances finding, the trial court generally denied Ruby Falls's substantive challenges. The court nevertheless determined that, given the timing of the hearing on the extension request and Ruby Falls's inability to present a meaningful response to the changed circumstances evidence, Ruby Falls had not been afforded adequate notice of the hearing and access to the staff report. Consequently, the Commission had failed to appropriately exercise its discretion to postpone the hearing as requested by Ruby Falls. The court granted a writ of administrative mandate solely as to the claim that Ruby Falls received inadequate notice and an unfair hearing process.

Ruby Falls filed this appeal following the trial court's entry of judgment granting the administrative writ of mandate and denying the writ of traditional mandate.

## II. DISCUSSION

Ruby Falls argues the trial court erred in failing to grant traditional mandate relief under section 1085 because the Commission's director had a ministerial duty to transfer and issue the CDP once Ruby Falls established proof of ownership. Ruby Falls additionally asserts entitlement to

13

administrative mandate relief under section 1094.5 because the Commission exceeded its jurisdiction in requiring Ruby Falls to apply for a permit extension and then abused its discretion in denying the extension request.

### A. Statutory Framework for Traditional Mandate and Administrative Mandate Claims

#### 1. Traditional Mandate

"A writ of mandate under section 1085 is a vehicle to compel a public entity to perform a legal duty, typically one that is ministerial." (*Citizens for Amending Proposition L v. City of Pomona* (2018) 28 Cal.App.5th 1159, 1173.) It "is the traditional remedy for the failure of a public official to perform a legal duty." (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442.)

To obtain relief under section 1085, a "petitioner must show (1) a clear, present, ministerial duty on the part of the respondent and (2) a correlative clear, present, and beneficial right in the petitioner to the performance of that duty." (*Howard Jarvis Taxpayers Assn. v. Amador Water Agency* (2019) 36 Cal.App.5th 279, 291 (*Howard Jarvis*); accord, *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 (*Kavanaugh*).) "A ministerial duty is an act that a public officer is obligated to perform in a prescribed manner required by law when a given state of facts exists." (*Howard Jarvis*, at p. 291; accord, *Kavanaugh*, at p. 916.) "Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 501–502 (*Rodriguez*).)

"On appeal following a trial court's decision on a petition for writ of mandate, we review the record to determine whether the trial court's findings are supported by substantial evidence, but we review de novo questions of

law involving statutory and constitutional interpretation." (*Howard Jarvis, supra,* 36 Cal.App.5th at p. 291.)

2. Administrative Mandate

In an action for administrative mandate under section 1094.5, the "court's inquiry extends to whether the agency acted in excess of jurisdiction or abused its discretion by not proceeding in the manner required by law." (*Schneider v. California Coastal Com.* (2006) 140 Cal.App.4th 1339, 1343 (*Schneider*); § 1094.5, subd. (b).[5])

An abuse of discretion is established if the respondent agency has "not proceeded in the manner required by law, the [agency's] order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) Whether the record supports the agency's findings and factual basis for its decision or order is a question of substantial evidence in light of the entire administrative record. (*Id.*, subd. (c); *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 921 (*McAllister*); see *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515.) On the other hand, "[w]here jurisdiction involves the interpretation of a statute, regulation, or ordinance, the issue of whether the agency proceeded in excess of its jurisdiction is a question of law." (*Schneider, supra,* 140 Cal.App.4th at pp. 1343–1344.) The court "exercises independent judgment on pure questions of law, including the interpretation of statutes and judicial precedent." (*McAllister*, at pp. 921–922.)

---

[5] While the trial court here granted the writ of administrative mandate based on another ground—deficiencies in the hearing (§ 1094.5, subd. (b))—neither party has appealed that finding or raised any arguments on that issue. The court's grant of relief on that basis therefore remains undisturbed.

15

In applying this standard on appeal, "we do not 'undertak[e] a review of the trial court's findings or conclusions. Instead, "we review the matter without reference to the trial court's actions. In mandamus actions, the trial court and appellate court perform the same function." ' " (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1197; *McAllister, supra*, 169 Cal.App.4th at p. 922.)

*B. Coastal Act and Regulatory Framework*

The California Coastal Act of 1976 (Coastal Act or Act) (Pub. Resources Code, § 30000 et seq.) "provides 'a comprehensive scheme to govern land use planning for the entire coastal zone of California.' " (*McAllister, supra*, 169 Cal.App.4th at p. 922; *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793 (*Pacific Palisades*).) Among its purposes, the Act serves to "[p]rotect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources." (Pub. Resources Code, § 30001.5, subd. (a).) The Coastal Act is to be "liberally construed to accomplish its purposes and objectives." (*Id.*, § 30009.)

Under the Coastal Act, "with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a coastal development permit 'in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency.' " (*Pacific Palisades, supra*, 55 Cal.4th at p. 794, quoting Pub. Resources Code, § 30600, subd. (a).) In addition, chapter 3 of the Act, titled "Coastal Resources Planning and Management Policies," contains policies governing development in the coastal zone. (Pub. Resources Code, §§ 30200–30270.) These policies constitute the "standards by which . . . the permissibility of proposed developments subject to the provisions of [the

16

Act] are determined." (*Id.*, § 30200, subd. (a).)  The Commission is "the entity with the primary responsibility for the implementation of the provisions of the Coastal Act." (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 20.)

The Commission oversees the coastal development permitting process in Monterey.[6]  (Pub. Resources Code, §§ 30600, subd. (c), 30604, subd. (a).) Permits may include reasonable terms and conditions to ensure development is consistent with the policies of the Act.  (*Id.*, § 30607; *Lindstrom v. California Coastal Com.* (2019) 40 Cal.App.5th 73, 92.)

Permits under the Act are further governed by provisions of the California Code of Regulations.  "Prior to issuance conditions are those conditions that are identified in the permit as conditions that must be complied with prior to issuance of the permit." (Cal. Code Regs., tit. 14, § 13158, subd. (e).)  Development as defined by the Act "shall not commence until an approved permit becomes effective." (*Id.*, § 13158, subd. (a); see Pub. Resources Code, § 30106 [defining actions that constitute " '[d]evelopment' "].)

Unless otherwise specified in the permit, the time for commencement for development "shall be two years from the date of the Commission vote upon the application." (Cal. Code Regs., tit. 14, § 13156, subd. (g).)  Prior to that time, "a permittee may apply to the executive director of the Commission for an extension of time not to exceed an additional one-year period." (*Id.*, § 13169, subd. (a).)  The extension "shall be denied" if three commissioners determine at the hearing on the extension "that there are changed circumstances that affect consistency of the development with [c]hapter 3

---

[6] While a certified local coastal program shifts development permitting authority from the Commission to the local government (Pub. Resources Code, § 30500, subd. (a); see *Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 362–363), Monterey does not have a certified local coastal program.

17

policies of the Coastal Act." (*Id.*, § 13169, subd. (d)(1).)  As examined further in our analysis *post*, a party may seek the transfer of a permit by submitting proof of having acquired the relevant property for approval by the director of the Commission.  (*Id.*, § 13170, subds. (a), (b).)

*C. Analysis*

1.  <u>Transfer & Issuance of Permit (Section 1085 Claim)</u>

Ruby Falls contends the director failed to perform a ministerial duty at two key junctures:  in refusing to transfer the CDP to Ruby Falls after receiving documentation under California Code of Regulations, title 14, section 13170 showing Ruby Falls had acquired the property, and in declining to issue the CDP after Ruby Falls executed and recorded the deed restriction as required by Special Condition 18.  The Commission counters that the authority of the director to transfer and issue the permit is discretionary.

We begin with the director's alleged duty to transfer the CDP.  Whether the director had a clear, present, ministerial duty to transfer and issue the CDP is a legal question subject to our independent review.  (*Rodriguez*, *supra*, 1 Cal.App.4th at p. 502; *Kavanaugh*, *supra*, 29 Cal.4th at p. 916; *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310.)  To ascertain the meaning of a statute or regulatory provision, we begin by examining its language, giving the words their usual and ordinary meaning.  (*McAllister*, *supra*, 169 Cal.App.4th at p. 928.)  "We examine the 'language, function and apparent purpose' of each cited enactment 'to determine if any or each creates a mandatory duty designed to protect against' the injury allegedly suffered by plaintiff."  (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898.)

The regulation governing the transfer of permits states:  "(a) Any person may request that the commission records be revised to reflect that he

18

or she has assumed the rights and obligations of a coastal development permit by acquiring property on which development has been approved, initiated, or completed pursuant to a permit by submission of the following: [¶] (1) an affidavit or notarized statement executed by the landowner attesting to the landowner's acknowledgment of the terms and conditions of the permit; and [¶] (2) evidence of the landowner's legal interest in the real property involved and legal capacity to undertake the development as approved and to satisfy the conditions required in the permit. [¶] (b) Upon the executive director's written approval of the documentation submitted, the documentation shall become part of the project file maintained by the commission." (Cal. Code Regs., tit. 14, § 13170, subds. (a), (b).)

Ruby Falls asserts that "the Commission's policy designates only specific items as 'evidence of the landowner's legal interest' in the subject property." The designated list to which Ruby Falls refers is contained in the Commission's form for CDP applications. That document states, " '<u>Proof of the applicant's legal interest in the property</u>. A copy of any of the following will be acceptable: current tax bill, recorded deed, lease, easement, or current policy of title insurance. Preliminary title reports will not be accepted for this purpose.' "

Relying on this list of acceptable evidence of legal interest, Ruby Falls contends that once one of the items of evidence is presented, along with the attestation acknowledging permit terms and conditions, the executive director has no discretion to refuse to transfer a CDP. Ruby Falls argues that "no law, regulation, or policy imposes additional criteria or requirements for transfer of a permit to a new owner. Nor does any law, regulation, or policy confer discretion on the [e]xecutive [d]irector—through his staff—to refuse a

19

CDP's transfer, if the owner presents at least one of the above-listed items of evidence."

Ruby Falls's interpretation lacks support in the plain language of the regulation. The regulation does not provide for an affirmative assignment or transfer of the permit. Rather, California Code of Regulations, section 13170 of title 14 authorizes the director to review the submission of evidence of legal interest and legal capacity and approve a request to update the Commission's records to reflect that a new owner has assumed the obligations under the permit.

The regulation sets out a two-step process for that change to occur. The first step, fulfilled by the party seeking the assumption of rights and obligations under the permit, requires the new landowner to submit two forms of documentation: (1) an affidavit or notarized statement of the landowner attesting to the terms and conditions of the permit; and (2) "evidence of the landowner's *legal interest* in the real property involved and *legal capacity to undertake the development* as approved and to satisfy the conditions required in the permit." (Cal. Code Regs., tit. 14, § 13170, subd. (a), italics added.) The second step, fulfilled by the Commission, requires the director's "*written approval* of the documentation submitted." (*Id.*, subd. (b), italics added.) Upon fulfillment of this second step, the purported transfer takes effect without further intervention (e.g., "the documentation shall become part of the project file maintained by the commission"). (*Ibid.*)

We do not discern in either of these steps a prescribed ministerial act, to be performed by the director " 'in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety' " (*Kavanaugh*, *supra*, 29 Cal.4th at p. 916).

20

At the first step, the language Ruby Falls cites as "the Commission's policy designat[ing] . . . specific items as 'evidence of the landowner's legal interest' in the subject property" is neither from a policy document nor from any of the relevant statutory sections or regulatory provisions. That the Commission has identified, in an administrative form, certain items as "acceptable evidence" to show legal interest in a property for purposes of the permit application process cannot reasonably be construed as providing statutory preapproval of their use for purposes of fulfilling the section 13170, subdivision (a) requirement of California Code of Regulations, title 14. We will not read into the statutory language a list of approved items of evidence that is nowhere contained within the provision. (*Ehrenkranz v. San Francisco Zen Center* (2026) 118 Cal.App.5th 977, 1002 [" '[A] cardinal rule of statutory construction[] [is] that it is not a judicial function to read into statutes language the Legislature might have used or might have intended. [Citations.] In other words, courts do not rewrite statutes.' "].)

Ruby Falls maintains that the form's list of acceptable evidence of legal interest is a "binding standard[]" and fits the statutory definition of a " 'regulation' " under Government Code section 11342.600. That section, which defines " '[r]egulation' " under the Administrative Procedure Act to include "every rule, regulation, order, or standard of general application . . . adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure" (Gov. Code § 11342.600) requires public notice and an opportunity for public comment before a regulation takes effect. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 259.) It is far from obvious that this standard applies to the list of acceptable documents set forth on the Commission's permit application form, and Ruby Falls has

produced no evidence that the form was subject to the notice and comment procedure. Because the purported designation by the Commission of specific items as acceptable evidence of the landowner's legal interest in the subject property is not part of the regulatory language, nor of any provision under the Coastal Act or California Code of Regulations, title 14, we disagree with Ruby Falls's characterization of the director's approval as merely ministerial upon receipt of an enumerated document.

Moreover, the language of the regulation—requiring that the landowner submit evidence establishing both a legal interest in the real property involved and legal capacity to undertake the development—and the second-step requiring the director's *written approval* of the submission, together suggest a case-specific determination over what document or evidence might satisfy both criteria in any given situation. As occurred in this case, proof of a legal interest in the property may not be sufficient to establish legal capacity to begin development where there is a material legal dispute or third-party claim affecting development rights. The decision in the *AquaLegacy* litigation over ownership of the property illustrates this point: that the trial court in that matter had originally ruled in favor of AquaLegacy underscores that the Commission did not act arbitrarily in suggesting there was a serious dispute about Ruby Falls's legal capacity to begin development. (See *AquaLegacy*, *supra*, H048978, H049062, H049160, H049368.)

Ruby Falls's suggestion that the director's approval under section 13170, subdivision (b) is limited to verifying that the documentation submitted is what it purports to be (i.e., an authenticity verification) does not appear to reflect the purpose of the provision, which premises any update to the project file upon "the executive director's written approval of the documentation submitted." (Cal. Code Regs., tit. 14, § 13170, subd. (b).)

Written approval connotes more than mere verification or authentication; it implies the exercise of judgment and stands in contrast with procedures requiring a determined outcome where specific criteria have been met. (See, e.g., *CV Amalgamated LLC v. City of Chula Vista* (2022) 82 Cal.App.5th 265, 281 [city's cannabis ordinance set out a two-phase application process in which the first phase required that applicants who met specified criteria be " '*deemed qualified* to submit' " the second phase application].)

We conclude that the language of California Code of Regulations, title 14, section 13170 does not prescribe a ministerial duty on the part of the director to automatically approve a transfer request " 'without regard to his own judgment or opinion concerning such act's propriety or impropriety' " (*Kavanaugh*, *supra*, 29 Cal.4th at p. 916) following the new landowner's submission of affidavit and a document establishing legal interest in the property under subdivision (a). The stated requirements afford discretion to the director to reject a submission that does not establish both the legal interest and legal capacity to begin development. The trial court therefore did not err in denying Ruby Falls's request for mandate relief on this ground.

Turning to the issuance of the CDP, Ruby Falls contends that the last condition it needed to satisfy to secure issuance of the CDP was recordation of a deed restriction set forth in Special Condition 18. Ruby Falls asserts that the director violated a ministerial duty to issue the permit once Ruby Falls fulfilled the condition. It argues that upon "receiving proof of recordation and therefore satisfaction of Special Condition [] 18, staff was *required* to issue the CDP to Ruby Falls." The Commission counters that the director's authority to determine whether Special Condition 18 was met is discretionary, not ministerial. Further, the Commission asserts the director

23

did not abuse that discretion in deciding, under the facts presented, that the property was subject to competing claims.

Special Condition 18 states, "Deed Restriction.  Prior to issuance of the coastal development permit, the permittee shall submit for executive director review and approval documentation demonstrating that the permittee has executed and recorded against the parcels governed by this permit a deed restriction, in a form and content acceptable to the executive director:  (1) indicating that, pursuant to this permit, the . . . Commission has authorized development on the subject property, subject to terms and conditions that restrict the use and enjoyment of that property; and (2) imposing the special conditions of this permit as covenants, conditions and restrictions on the use and enjoyment of the property.  . . .  The deed restriction shall also indicate that, in the event of an extinguishment or termination of the deed restriction for any reason, the terms and conditions of this permit shall continue to restrict the use and enjoyment of the subject property so long as either this permit or the development it authorizes, or any part, modification, or amendment thereof, remains in existence on or with respect to the subject property."  (Some capitalization omitted.)

Like the regulation discussed above in connection with the request to transfer the CDP, the language of this condition vests the director with the authority to "review and approv[e]" the documentation submitted "in a form and content acceptable to the" director.  Special Condition 18 sets forth the prerequisites that the permittee must fulfill as a precondition to the CDP being issued; but nothing in the terms of the condition requires the CDP to issue ipso facto upon execution and recordation of the deed restriction.  Nor does the language of the special condition limit or define the director's consideration of factors that might influence what form and content is

24

"acceptable" under the circumstances of a given case or, more basically, whether the party submitting the deed restriction is in fact the "permittee" where, as here, the property has changed ownership. Furthermore, the CDP expressly speaks to the director's discretion relating to any of the subject conditions by specifying, in Standard Condition 3, that "[a]ny questions of intent or interpretation of any condition will be resolved by the [e]xecutive [d]irector or the Commission."

As support for its argument that Special Condition 18 presents a ministerial duty, Ruby Falls asserts that it obtained from Commission staff a draft deed restriction and instructions as to the " 'form and content' " to ensure that the deed restriction ultimately submitted would satisfy the condition's requirement that execution and recordation be in a " 'form and content acceptable to the [e]xecutive [d]irector.' " Ruby Falls argues that the form and content instructions from Commission staff effectively reflected the director's "pre-approv[al]" of the documentation Ruby Falls ultimately submitted, so that staff was required to accept the proof of satisfaction of the condition and could not refuse it on the ground there was an ongoing dispute over ownership. (Italics omitted.)

We disagree that e-mail correspondence from a Commission staff person to explain the form and content requirements of the deed restriction recordation process reduced the director's approval of Ruby Falls's submission to a purely ministerial task.[7] It is the language of the CDP

---

[7] Pursuant to California Rules of Court, rule 8.252, Ruby Falls has requested that this court take judicial notice of the e-mail correspondence from 2017 between Commission staff and Ruby Falls principals regarding the deed restriction requirements and providing a generic deed restriction form and instructions for completion. Ruby Falls maintains that the material presented for judicial notice was not before the trial court because it had been inadvertently omitted from the administrative record compiled by the

25

conditions, and specifically that of Special Condition 18, that determines whether the director lacks discretion to reject performance of the special condition based on his judgment and evaluation of the circumstances of performance. Because the condition required the director's review and approval of any submission, the director retained discretionary authority to consider circumstances surrounding execution or recordation of the deed restriction that could warrant withholding issuance of the CDP.

Ruby Falls further asserts that the director could not reject an otherwise adequate (in form and content) deed description based on a legal dispute over ownership of the property. It argues that the appellate decision in *AquaLegacy*, *supra*, H048978, H049062, H049160, H049368, only confirmed what its "uncontroverted proof of ownership already established:

Commission. Ruby Falls discovered the omission in the process of briefing this appeal. The Commission has opposed the motion.

After reviewing the parties' arguments and the requested materials, we decide that the e-mail correspondence and attachments do not come within either subdivision of Evidence Code section 452 cited by Ruby Falls. An informal e-mail from a Commission staffer to Ruby Falls principals sent as follow-up to a meeting in which the staff person expressed his hope that the information would be "enough to get you started" does not represent an "[o]fficial act" of the Commission (Evid. Code, § 452, subd. (c)) and may not reasonably be compared to a letter from the State Department to the United States President on implementing international convention procedures (*Landstar Global Logistics, Inc. v. Robinson & Robinson, Inc.* (2013) 216 Cal.App.4th 378, 388, fn. 4), or to letters released by the Department of Social Services providing formal instructions to counties on the implementation of legislation regarding funding services for foster children (*In re Social Services Payment Cases* (2008) 166 Cal.App.4th 1249, 1261). Nor do we agree that the e-mail may be judicially noticed as "[f]acts and propositions that . . . are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (Evid. Code, § 452, subd. (h)). We therefore deny Ruby Falls's request for judicial notice of the 2017 e-mail correspondence regarding the deed restriction requirements.

26

Ruby Falls is—and since 2017 has been—the rightful owner of the [p]roperty." However, even assuming there was no inadequacy as to "form and content" of the deed restriction (which the Commission appears to concede), it was unclear whether Ruby Falls had the right as the owner and permittee to record the deed restriction encumbering the property. That Ruby Falls ultimately prevailed in the ownership dispute by obtaining reversal on appeal of the trial court's judgment in favor of AquaLegacy does not change the uncertainty at the time Ruby Falls sought issuance of the CDP regarding its ability to fulfill Special Condition 18 as the permittee. Nothing in the language of the condition or the CDP limited the director from exercising discretion to consider the possible effect of that dispute on Ruby Falls's submission of the deed restriction.

We conclude the trial court did not err in denying Ruby Falls's request for traditional mandate relief.

2. <u>Permit Extension Process and Denial (Section 1094.5 Claim)</u>

Ruby Falls raises two primary issues in support of its claim for administrative mandate. First, it contends the Commission exceeded its jurisdiction by requiring an extension of the CDP. Ruby Falls makes two alternative arguments against the extension requirement. It maintains that a permit extension was unnecessary because either Ruby Falls had in fact already commenced development under the terms of the permit or the permit had not expired due to equitable tolling. Second, Ruby Falls contends the Commission abused its discretion by denying the extension request based on a finding of changed circumstances. Ruby Falls argues that the Commission's finding of changed circumstances lacks substantial evidence and relies on policy documents outside the scope of the Coastal Act. We examine each contention in turn.

27

a. Commission Jurisdiction to Require Permit Extension

Ruby Falls asserts that the Commission exceeded its jurisdiction by requiring the permit extension because (1) the CDP had already vested in Ruby Falls under the conditionally approved CDP, or, alternatively, (2) equitable tolling or estoppel barred the CDP's expiration so that no extension was required. The Commission counters that both theories are legally flawed and unsupported by the record.

The permit schedule, expiration, and extension terms are governed by the conditions of approval of the CDP and governing regulations. Standard Condition 1 states, "Notice of receipt and acknowledgement. The permit is not valid and development shall not commence until a copy of the permit, signed by the permittee or authorized agent, acknowledging receipt of the permit and acceptance of the terms and conditions, is returned to the Commission office." (Boldface & some capitalization omitted.) This language reflects the regulation for permit receipt and acknowledgment. (Cal. Code Regs., tit. 14, § 13158, subds. (a), (b).) Further, Standard Condition 2 states, "Expiration. If development has not commenced, the permit will expire two years from the date on which the Commission voted on the application. Development shall be pursued in a diligent manner and completed in a reasonable period of time. Application for extension of the permit must be made prior to the expiration date." (Boldface omitted.)

The term " '[d]evelopment' " is defined in the Coastal Act to include, inter alia, "the placement or erection of any solid material or structure," "grading, removing, dredging, mining, or extraction of any materials," "change in the density or intensity of use of land," "change in the intensity of use of water, or of access thereto," and "construction, reconstruction,

28

demolition, or alteration of the size of any structure." (Pub. Resources Code, § 30106.)

Ruby Falls contends that development under Standard Condition 2 had commenced, thus eliminating the need for an extension of the CDP. Ruby Falls argues that the Commission has long recognized that commencement of development for purposes of exercising a permit is not the same as commencement of construction. Ruby Falls cites *Trancas Property Owners Assn. v. City of Malibu* (1998) 61 Cal.App.4th 1058 (*Trancas*) as support for its position that by diligently performing all the actions required to carry out the conditions of the permit (including filing an affidavit accepting CDP terms and conditions, presenting items of proof of legal interest in the property, recording the required deed restriction, and attempting to arrange interagency meetings to move the project forward), it had done everything within its power to commence development. Ruby Falls maintains that only the Commission's refusal to honor its own policies and practices prevented the project from going forward.

We are sympathetic to Ruby Falls's position given its repeated efforts to obtain transfer and issuance of the CDP, meet with overseeing agencies, and commence development. Nevertheless, we disagree that Ruby Falls commenced development within the meaning of the permit language, regulation, and statute.

Pursuant to the regulation, development does not legally commence until the approved permit becomes effective, which requires all prior-to-issuance permit conditions to be satisfied and the permit to be issued. (Cal. Code. Regs., tit. 14, § 13158, subds. (a)–(e).) A permit that has not been issued is not effective, and "[d]evelopment shall not commence until an approved permit becomes effective." (*Id.*, subd. (a).) In this case, the prior-to-

29

issuance condition attached to the CDP, Special Condition 18, was not satisfied because the director declined to approve the recorded deed restriction. The Commission's refusal to approve the permit due to the ongoing litigation over the property's ownership meant that Ruby Falls did not satisfy the prior-to-issuance condition, the CDP was not issued, and development did not commence under the regulation and Standard Condition 1.

Nor does Ruby Falls attempt to show how the steps it took to try to secure assignment and issuance of the permit, as well as agency buy-in and collaboration, come within the meaning of " 'development' " as that term is defined in the Coastal Act. Courts recognize that "[a]n expansive interpretation of 'development' is consistent with the mandate that the Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' " (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 796.) Thus, it has been held that " 'development' " under the Coastal Act "goes beyond 'what is commonly regarded as a development of real property' [citation] and is not restricted to activities that physically alter the land or water." (*Ibid*.) Despite the expansive definition embraced in case law, Ruby Falls points to no cases (nor are we aware of any) in which predicate actions to *secure* transfer or issuance of the permit in the first instance qualify as development within the meaning of the statute and regulations.

*Trancas,* upon which Ruby Falls principally relies, is legally and factually inapposite. *Trancas* involved a coastal development permit that was set to expire on March 12, 1997. The developer had submitted its final subdivision map months before the deadline, which was accepted by the city's engineer, but the developer did not obtain the city's approval of the map until after the deadline. (*Trancas*, *supra*, 61 Cal.App.4th at p. 1060.) An

association of property owners sued to halt the project, arguing that under the then-operative regulations, the permit had expired because development of the project—meaning *construction*—had not yet commenced. (*Ibid*.) The appellate court affirmed the trial court's denial of the association's motion for preliminary injunction. It held that " 'project' " and " 'construction' " are not synonymous for purposes of determining whether a permit issued by the Commission was exercised before its expiration date (*ibid*.), and approval of the final subdivision map by the city's engineer (which predated expiration of the permit) commenced the project and avoided its expiration. (*Id*. at p. 1061.)

Ruby Falls asserts that the relevant legal principle derived from *Trancas*, which applies equally here, is that it would be unfair to require the applicant to obtain a permit extension where " 'the applicant has diligently performed all the acts necessary to carry out the conditions of the permit.' " (*Trancas*, *supra*, 61 Cal.App.4th at p. 1061.) However, the quoted language does not reflect the holding of the case but instead the Commission's position in the *Trancas* litigation. In *Trancas*, the Commission argued that the term " 'project' " has a broader meaning than the term " 'construction,' " and that the application to obtain final subdivision map approval by the city before the permit deadline constituted commencement of the project (since the city should have "rubber stamped" the approval after its engineer accepted the map) and activated the permit. (*Ibid*.) Here, the question is not whether construction is synonymous with development, but whether steps taken by the applicant to satisfy the conditions to exercise the permit constitute "development" even if the permit is not yet effective. The plain language of the CDP, regulations, and statute, do not support such an interpretation.

31

Moreover, there is a critical factual distinction between this case and *Trancas* that undermines its relevance to this appeal. In *Trancas*, the only predicate to the permit being exercised was the need to demonstrate " 'commencement of the project' " (*Trancas*, *supra*, 61 Cal.App.4th at p. 1060), whereas here, there is an additional predicate that has not been satisfied— that of the prior-to-issuance condition. Because the Commission did not accept satisfaction of the prior-to-issuance condition due to the ownership dispute, the determination that development had not yet commenced is based not only on the absence of steps constituting development, but the lack of the underlying prerequisite for development to begin.

Ruby Falls next contends that if development did not commence (and, under the circumstances, could not have commenced), then this court should determine that the principles of equitable tolling or equitable estoppel barred the expiration of the CDP and rendered unnecessary the application for an extension. However, Ruby Falls fails to demonstrate how either of these equitable principles applies on the facts presented. It asserts only that "[e]quitable tolling requires that the expiration period be suspended until such time that the Commission transfers and issues the CDP, as required by law" and, "[a]lternatively, the Commission should be estopped from asserting CDP expiration after placing roadblock after roadblock in Ruby Falls'[s] way, as Ruby Falls worked to obtain formal transfer and issuance of the permit, and to commence the [p]roject."

These arguments fail to establish the elements of equitable tolling or estoppel. The doctrine of equitable tolling typically applies in the statute of limitations context to " 'suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness' " (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 99.) The

32

doctrine "applies 'occasionally and in special situations' to 'soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court.' " (*Saint Francis Memorial Hospital v. State Department of Public Health* (2020) 9 Cal.5th 710, 719 (*Saint Francis*).) Equitable tolling can also apply to toll a statute of limitations period while the plaintiff pursues an alternate, administrative remedy. (*McDonald*, at p. 101.) A panel of this court in *City of Salinas v. Workers' Comp. Appeals Bd.* (2025) 113 Cal.App.5th 801 , review granted November 19, 2025, S293212, recently held that the doctrine could apply (in narrowly limited circumstances) to the Workers' Compensation Appeals Board's statutory deadline to adjudicate a petition for reconsideration of a decision by a workers' compensation administrative law judge. (*Id.* at p. 825.)

Ruby Falls fails to meaningfully develop its argument that equitable tolling should apply here. It has not attempted to explain how the three elements typically considered for the application of equitable tolling—timely notice, lack of prejudice to the defendant, and reasonable and good faith conduct by the plaintiff (*Saint Francis*, *supra*, 9 Cal.5th at p. 724)—apply to the facts presented. "We are not required to develop a party's argument for it nor to search the record on our own seeking deficiencies." (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 955.) We decide Ruby Falls has forfeited any argument in support of equitable tolling based on its failure to specify the application of the doctrine's multi-factor requirements. (See *ibid*.)

Ruby Falls similarly does not offer any explanation of how the doctrine of equitable estoppel applies in this instance. Unlike equitable tolling, which addresses " ' "circumstances in which the running of the limitations period may be suspended" ' " (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383), equitable estoppel " ' "comes into play only after the limitations period has

33

run and addresses . . . the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period." ' " (*Ibid*.) Because we have concluded the Commission did not violate a ministerial duty in denying the CDP and did not exceed its jurisdiction in requiring Ruby Falls to apply for an extension of the expiring permit, we reject as unsupported by the record Ruby Falls's argument that proceeding with the permit extension hearing would permit the Commission to profit from its wrongful withholding of the CDP.

We decide that Ruby Falls has not established that the Commission acted in excess of its jurisdiction in requiring Ruby Falls to apply for an extension of the CDP.

   b. Changed Circumstances Finding

Ruby Falls contends that the Commission abused its discretion in denying Ruby Falls's CDP extension request because the Commission's finding of changed circumstances was error. Ruby Falls maintains that the standard for denial of a permit extension, which requires the director to "determine whether there are changed circumstances that may affect the consistency of the development with the policies of [c]hapter 3 of the Coastal Act" (Cal. Code Regs., tit. 14, § 13169, subd. (b)), was not met here because (1) the documents the Commission relied on to find changed circumstances are not Coastal Act policies, and (2) substantial evidence in the record does not support the Commission's findings of changed circumstances based on the issues of water supply and coastal hazards.

The Commission's staff report made detailed findings on the issue of changed circumstances. Regarding water supply, the report examined

34

Coastal Act policies pertaining to water supply, coastal waters and resources, and the onsite desalination plant. The referenced Coastal Act policies include those pertaining to locating new development within or close to "existing developed areas able to accommodate [the development] . . . and where it will not have significant adverse effects . . . on coastal resources" (Pub. Resources Code, § 30250, subd. (a)), limiting "[n]ew or expanded public works facilities . . . consistent with the provisions of this division" (*id.*, § 30254), and protecting marine resources, and maintaining the biological productivity and quality of coastal waters, and of areas adjacent to environmentally sensitive habitat areas (*id.*, §§ 30230, 30231, 30233, subd. (a), 30240, subd. (b)).

The staff report stated that, due to water supply limitations in the Monterey Peninsula, the original project applicant obtained approval for an onsite desalination facility to provide the 27.89 acre-feet of water per year needed to serve the Cannery Row project. The approved intake and discharge pipelines and ocean-based structures for the desalination facility were to be located in the waters of the Monterey Bay National Marine Sanctuary, which are also designated by the California Department of Fish and Wildlife as a State Marine Conservation Area, a category of Marine Protected Area under the California Marine Life Protection Act.

The staff report explained that in May 2015, the SWRCB adopted the Ocean Plan Amendment to address effects associated with the construction and operation of seawater desalination facilities. The Ocean Plan Amendment prohibits desalination intake and discharge structures in a Marine Protected Area unless the desalination structures can be constructed, operated, and maintained "without marine life mortality." The staff report concluded that the Ocean Plan Amendment rendered the design of the approved desalination plant infeasible and noted that staff from agencies

35

with regulatory authority over the desalination plant (the SWRCB and RWQCB) "all concur that the desalination portion of the project cannot be constructed, operated or maintained consistent with the Ocean Plan or the [California Marine Life Protection Act]." The staff report further noted, based on the administrative record, that it did not appear there were desalination options that could be found consistent with the Ocean Plan at the proposed location, and there appeared to be no other options available for water supply.

As for the issue of coastal hazards due to sea level rise, the staff report cited the relevant Coastal Act policies that address shoreline protective devices and require minimizing risks to life and property in areas of high flood or geologic hazard (Pub. Resources Code, §§ 30235, 30253). It also set out changes in scientific information that had become available since the project's approval in 2008. In 2015, the Commission adopted a document titled " 'Sea Level Rise Policy Guidance' " summarizing the best available science on sea level rise in California. That document was further updated in 2018 (hereafter, 2018 Sea Level Guidance). The staff report found that the 2018 Sea Level Guidance estimated a significantly higher level of sea level rise in Monterey over the next 80 years than was evaluated for the 2008 CDP approval, and that a portion of the project site would potentially be affected by sea level rise as early as 2030.

The staff report concluded that, even presuming the project applicants "can identify an adequate and sustainable water source, these changed coastal hazard circumstances are likely to require substantial redesign of the project in order for it to be able to be found consistent with the Coastal Act." It explained that per regulations, a Commission finding of changed circumstances would result in denial of the CDP extension and allow the

project to be reviewed de novo at a future date, provided the applicants have submitted the required filing fee and information to address the changed circumstances. This could include presenting evidence of an adequate water supply to serve the project and updated project plans to respond to the water supply and coastal hazards evaluations.

Ruby Falls contends that neither the Ocean Plan Amendment nor the 2018 Sea Level Guidance are policies of the Coastal Act, and therefore the Commission cannot rely on them as the basis for its changed circumstances finding. The Commission counters that this interpretation of the statutory language is at odds with the definition of changed circumstances and with the practical and common sense manner in which agencies exercise their authority, including by relying on documents from and research conducted by other agencies.

Whether the Coastal Act regulations restrict the Commission from referencing documentation from other agencies in deciding "whether there are changed circumstances that may affect the consistency of the development with the policies of [c]hapter 3 of the Coastal Act" (Cal. Code Regs., tit. 14, § 13169, subd. (b)) is a matter of statutory interpretation subject to our independent review. (*McAllister*, *supra*, 169 Cal.App.4th at pp. 921–922.) A failure by the Commission to proceed in the manner required by law would constitute an abuse of discretion. (§ 1094.5, subd. (b).)

Our fundamental task in construing a statute or regulation is to ascertain and effectuate its purpose. We begin by examining the language, giving the words their usual and ordinary meaning, and if we find no ambiguity, the plain meaning of the language governs. (*McAllister*, *supra*, 169 Cal.App.4th at p. 928.) "When a provision of the Coastal Act is at issue, we are enjoined to construe it liberally to accomplish its purposes and

objectives, giving the highest priority to environmental considerations."
(*Ibid.*, citing Pub. Resources Code, § 30009.)

As stated in the regulation, when a project applicant applies for a one-year permit extension, "the executive director shall determine whether there are changed circumstances that may affect the consistency of the development with the policies of [c]hapter 3 of the Coastal Act or with a certified local coastal program, if applicable." (Cal. Code Regs., tit. 14, § 13169, subd. (b).) The Commission acknowledges that the Ocean Plan Amendment and 2018 Sea Level Guidance are not themselves " 'policies of [c]hapter 3 of the Coastal Act' " but argues that the former may be considered for their relevance in ascertaining whether there exists changed circumstances *with* those policies set forth in chapter 3 of the Act.

We agree. The regulation directs the director to decide whether there are any changed circumstances that may affect the consistency of the proposed development with the Coastal Act policies. (Cal. Code Regs., tit. 14, § 13169, subd. (b).) The focus of the inquiry is the consistency of any changed circumstances related to the development with the statutory policies. The limitation of significant adverse effects of development on coastal resources (Pub. Resources Code, § 30250, subd. (a)) and the protection of marine resources, coastal water quality, and areas adjacent to environmentally sensitive habitat areas (*id.*, §§ 30230, 30231, 30233, subd. (a), 30240, subd. (b)) are each "policies of [c]hapter 3 of the Coastal Act." (Cal. Code Regs., tit. 14, § 13169, subd. (b).)

Implicit in the language of California Code of Regulations, title 14, section 13169, subdivision (b) is that the Commission should undertake a comparative analysis of any changed circumstances with respect to the statutory policies set out in chapter 3 of the Act. But the regulation does not

dictate how the director is to make that determination. Nor does the regulation delineate what factors the Commission may take into consideration in evaluating consistency with the chapter 3 policies. (See Cal. Code Regs., tit. 14, § 13169, subd. (b).) Rather, the Coastal Act policies provide the metric for evaluating the relevance of changed circumstances. That evaluation necessarily implies consideration of relevant data and information regarding the changed circumstances that may assist in making the consistency determination. Nothing in the language of California Code of Regulations, title 14, section 13169, restricts or limits the director from considering input (such as agency reports, scientific guidelines, and regulatory updates) that might assist the Commission in determining whether the development remains consistent with Coastal Act polices.

We disagree with Ruby Falls that to interpret California Code of Regulations, title 14, section 13169, subdivision (b) as allowing the Commission to consider documents produced by other agencies would effectively rewrite the regulation to " 'policies of [c]hapter 3 of the Coastal Act *and any other document that addresses said policies*." (Italics added.) A more natural reading of the regulatory provision is that the director's evaluation of changed circumstances that affect the development's consistency with the Coastal Act policies can include input from other agencies, so long as the extension decision is ultimately based on whether the changed circumstances affect consistency with the Coastal Act's [c]hapter 3 policies. This interpretation is consistent with both the plain language of California Code of Regulations, title 14, section 13169 and the mandate to liberally construe Coastal Act provisions to accomplish the purposes and objectives of the statute. (Pub. Resources Code, § 30009.)

Given our understanding of the regulation, we decide the Commission did not abuse its discretion in referring to the Ocean Plan Amendment and 2018 Sea Level Guidance, both of which contain information relevant to assessing whether changed circumstances might affect the Cannery Row project's consistency with Coastal Act policies. By way of example, the Ocean Plan Amendment's severe restriction on desalination intake and discharge structures in a Marine Protected Area and Commission staff's finding that the project's desalination plant would not be feasible under that standard is unquestionably relevant to a finding of changed circumstances and "the consistency of the development with the policies of [c]hapter 3 of the Coastal Act" (Cal. Code Regs., tit. 14, § 13169, subd. (b)), including Public Resources Code sections 30250 (on limiting significant adverse effects on coastal resources) and 30230 (on maintaining marine resources).

We also are not persuaded by Ruby Falls's contention that the Commission's finding of changed circumstances on the issues of water supply and sea level rise lacks substantial evidence in the record. In reviewing the Commission's decision, we presume it is supported by substantial evidence, and the petitioner (here, Ruby Falls) bears the burden of demonstrating the contrary. (*McAllister*, *supra*, 169 Cal.App.4th at p. 921; *Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 921 (*Ross*).) We examine the entire record and consider all relevant evidence, including that which detracts from the administrative decision, but we do not substitute our own findings and inferences for that of the Commission. " '[I]t is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it.' " (*Ross*, at p. 922; *McAllister*, at p. 921.)

Ruby Falls argues that the Ocean Plan Amendment and 2018 Sea Level Guidance do not supply substantial evidence of changed circumstances because those documents were already in existence when the Commission previously granted one-year permit extensions (in 2016 and 2017) and because Ruby Falls presented information challenging the Commission's technical conclusions.

As to the question of water supply, Ruby Falls asserts that the Commission "granted the 2016 and 2017 extensions on the premise that there were no 'changed circumstances' despite the existence of those two documents." It argues that when the Commission previously granted the one-year extension in 2017, it considered the effect of the Ocean Plan Amendment on water supply for the project and correctly concluded it would be up to the relevant regulatory agencies (like the RWQCB) and the permit holder to determine whether a desalination facility could be built consistent with Public Resources Code section 30250, subdivision (a) (requiring new development to be located in or near "existing developed areas able to accommodate it"). Ruby Falls states that this determination would be accomplished via Special Condition 15 of the CDP, which requires the permit holder to obtain regulatory agency approval before commencing construction and, as the Commission observed in the 2017 permit extension, " '[i]f project changes are required by the RWQCB, such changes may require an amendment to this CDP.' "

Ruby Falls contends that, as there was no change in the Ocean Plan Amendment between 2017 and 2019, the Commission's change in conclusion from the grant of the 2017 permit extension to finding that " 'it does not appear that there are desalination options that *could* be found consistent with the Ocean Plan at this location' " was arbitrary and without record

41

support. Further, Ruby Falls asserts it presented substantial evidence that it *could* construct a desalination facility consistent with the Ocean Plan Amendment if allowed to pursue a permit amendment through the review and approval process contemplated by Special Condition 15.

Regarding the issue of coastal hazards due to sea level rise, Ruby Falls maintains that the Commission's finding based on the 2018 Sea Level Guidance speculatively assumed a highly unlikely rise in sea level for the region by citing an increase with only a one-in-200 chance of occurring. Ruby Falls contends, by contrast, that it presented a 2019 site-specific technical report prepared by a team of expert consultants which found no impact on any habitable area of the project based on the most severe circumstances projected within the next 80 years and only a limited potential for water intrusion in the parking garage during certain high tide and storm surge conditions—a finding not dissimilar to the coastal hazards already discussed in the 2008 CDP approval.

These arguments reflect a dispute over the Commission's changed circumstances finding and suggest that Ruby Falls may be able to propose design changes or measures to address the effects of the water supply and coastal hazard issues raised at a subsequent hearing for permit review. (Cal. Code of Regs., tit. 14, § 13169, subd. (d)(1).) However, Ruby Falls has not shown an absence of substantial evidence in the record to support the Commission's changed circumstances finding. The record pertaining to the prior extensions shows that in issuing the 2016 extension, the Commission noted there was an outstanding question of changed circumstances based on water supply and specifically raised the issue of policy consistency based on the Ocean Plan Amendment. Given that there was also an unresolved ownership dispute, the Commission reasonably decided it was appropriate to

42

grant the extension to allow the applicants time to resolve the outstanding dispute and address the water supply question. That decision does not amount to a prior finding of no changed circumstances.

Moreover, Ruby Falls does not dispute the evidence upon which the Commission based its determination—after consulting with those agencies with regulatory oversight—that the desalination facility as approved cannot be constructed, operated, and maintained without violating the Ocean Plan Amendment. Ruby Falls's assertion that it submitted evidence of its work with expert consultants and the RWQCB on an alternative design for the desalination facility "that would not require ocean intake or discharge" effectively concedes changed circumstances requiring proposed amendments to the CDP. While Ruby Falls undoubtedly would prefer to address the requirements of the Ocean Plan Amendment and any related changes to the project through the regulatory approval process mandated by Special Condition 15 before commencing construction, it has not shown the Commission's changed circumstances finding in the permit extension context to be unsupported by substantial evidence in the record. (See *McAllister*, *supra*, 169 Cal.App.4th at p. 921; *Ross*, *supra*, 199 Cal.App.4th at p. 921.)

Similarly, Ruby Falls has not shown the Commission's decision regarding coastal hazards to lack sufficient evidence in the record. The staff report on the 2019 permit extension cited the difference in sea level rise between the projections available in 2008 and those available in 2018, the Commission's resulting understanding of the coastal hazards affecting portions of the project site, and its conclusion that the degree of threat to the site was "much more severe" than previously understood, affecting consistency with policies including Public Resources Code section 30253. The record thus supports the Commission's changed circumstances finding on this

43

issue.  That Ruby Falls disagrees with the Commission's reliance on the 2018 Sea Level Guidance's " 'medium-high risk aversion scenario' " or submitted for the Commission's consideration a competing technical report on projected sea level rise, does not alter or undermine the existence of substantial evidence to support the Commission's finding.

We conclude Ruby Falls has not shown error in the trial court's denial of its petition for writ of administrative mandate.

### III.  DISPOSITION

The judgment of the trial court is affirmed.  The Commission is entitled to its reasonable costs on appeal.  (Cal. Rules of Court, rule. 8.278(a)(1), (2).)

44

_____
Danner, J.

WE CONCUR:


_____
Greenwood, P. J.


_____
Bromberg, J.




**H053262**
*Ruby Falls Fund, LLC v. Ainsworth et al.*